AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
### for the
Eastern District of Virginia

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) ) | Case No. 4:24sw00009 |
| INFORMATION ASSOCIATED WITH THE VERIZON.NET ACCOUNT MGMDD@VERIZON.NET STORED AT PREMISES CONTROLLED BY YAHOO INC. | ) ) ) | |

**FILED**

JAN 1 7 2024

CLERK U.S. DISTRICT COURT
NEWPORT NEWS, VA

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-3

located in the _____ Northern _____ District of _____ California _____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment C

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 42 U.S.C. § 3631 | Interference with Housing |
| 18 U.S.C. §§ 641, 875, 1010, 1028A, 1343 | Theft of Government Property; Interstate Communications with Threats to Injure; False Statement to HUD; Aggravated Identity Theft; Wire Fraud |

The application is based on these facts:

See Affidavit

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Reviewed by AUSA/SAUSA:

AUSA Julie D. Podlesni
*Printed name and title*

*Applicant's signature*

Special Agent Theodore Y. Roese, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 1/17/24

*Judge's signature*

City and state: Newport News, Virginia

Hon. Douglas E. Miller, U.S. Magistrate Judge
*Printed name and title*

**ATTACHMENT A-3**
**(SUBJECT ACCOUNT)**
*Property to be searched*

This warrant applies to information associated with the SUBJECT ACCOUNT:

MGMDD@verizon.net

that is stored at premises owned, maintained, controlled, or operated by Yahoo Inc. ("Yahoo"), a company headquartered at 770 Broadway, 9th Floor, New York, New York, and with an address for service of legal process of 391 San Antonio Road, 5th Floor, Mountain View, California 94040, (hereinafter the "Service Provider").

.

## ATTACHMENT C
*Particular Things to be Seized*

**I.    Information to be disclosed by Yahoo Inc. ("Yahoo")**

To the extent that the information described in Attachment A-3 is within the possession, custody, or control of Yahoo, regardless of whether such information is located within or outside of the United States, and including any emails, records, files, logs, or information that has been deleted but is still available to Yahoo, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Yahoo is required to disclose the following information to the government for each account or identifier listed in Attachment A-3:

A. All business records and subscriber information, in any form kept, pertaining to the Account, including:

1.  Identity and contact information (past and current), including full name, e-mail addresses, physical address, date of birth, phone numbers, gender, hometown, occupation, websites, and other personal identifiers;

2.  All Verizon or Yahoo usernames (past and current) and the date and time each username was active, all associated Verizon and Yahoo accounts (including a list of linked accounts based upon IP address and session cookie), and all records or other information about connections with Yahoo, third-party websites, and mobile apps (whether active, expired, or removed);

3.  All records or other information stored at any time by an individual using the account, including address books, contact and buddy lists, calendar data, pictures, and files;

4.  Length of service (including start date), types of services utilized, purchases, and means and sources of payment (including any credit card or bank account number) and billing records;

5.  Devices used to login to or access the account, including all device identifiers, attributes, user agent strings, and information about networks and connections, cookies, operating systems, and apps and web browsers;

6.  All advertising information, including advertising IDs, ad activity, and ad topic preferences;

7.  Internet Protocol ("IP") addresses used to create, login, and use the account, including associated dates, times, and port numbers, from **January 1, 2018**, to **present**;

8.  Privacy and account settings, including change history; and

9.  Communications between Yahoo and any person regarding the account, including contacts with support services and records of actions taken;

-1-

B. From **January 1, 2018**, to **present**, all content (whether created, uploaded, or shared by or with the Account), records, and other information relating to:

1. Communications sent from or received by the Account, including but not limited to:

    i. The content of all emails and any other communications sent from or received by the Account and all associated multimedia and metadata, including deleted and draft content if available;

    ii. All records and other information about other messages sent from or received by the Account, including dates and times, methods, sources and destinations (including usernames and account information), and status; and

    iii. All associated logs and metadata;

2. All records of searches performed by the account; and

3. All location information, including location history, login activity, information geotags, and related metadata.

Yahoo is hereby ordered to disclose the above information to the government within 14 days of the issuance of this warrant.

## II.    Information to be seized by the government

All information described above in Section I that constitutes fruits, contraband, evidence, and instrumentalities of violations of the Subject Offenses – *i.e.* 42 U.S.C. § 3631 (Interference with Housing) and 18 U.S.C. §§ 641 (Theft of Government Property), 875 (Interstate Communications with Threats to Injure), 1010 (False Statement to HUD), 1028A (Aggravated Identity Theft), 1343 (Wire Fraud), including attempting or conspiring to commit the same or aiding and abetting the commission thereof (collectively the "SUBJECT OFFENSES") – including for the SUBJECT ACCOUNT, information pertaining to the following matters:

A. All records or other information relating to MERRYMAN's and MGM's properties and business; applications for rent relief payments; financial transactions related to his rentals; communications related to the advertisement or condition of his properties or to request for repairs; Section 8 related communications; VHDA related communications, communications with tenants; communications regarding use of force within the context of his business or in connection with the race of the victim; discriminatory or harassing communications related to discriminatory bias in how he conducted his business; and communications related to the specific acts outlined in the attached affidavit, with all communications also including any preparatory efforts or efforts to conceal the same, as well as communications as to MERRYMAN's state of mind with respect to engagement with law enforcement or legal process, including about the destruction or concealment of evidence or communications, witness tampering, and to possession and use of other relevant evidence, including the SUBJECT PROPERTY, any related devices, relevant firearms, etc.;

-2-

B. All records related to the SUBJECT PROPERTY and to MERRYMAN's rental properties, including any records related to: leases and lease agreements; properties; rent or other related payments, such as ledgers, invoices, and receipts; correspondence with and records pertaining to any related government authority such as city inspections, and applications and correspondence to local, state, and federal housing programs; correspondence with any tenant or prospective tenant; property tax records; maintenance logs, requests for service, invoices or estimates for services; purchase orders, credit and other account information

C. Any biographic information such as facial recognition, fingerprints, DNA, as well as account user IDs, combinations, codes, passwords, or PINs as required to access any evidence subject to search as defined in Attachments A-1 through A-3.

D. All employee/employment related records, including contracts, payroll records, employee identification information, timesheets, withholding and other tax records, communications between MERRYMAN and his employees, etc.

E. Access, use, ownership, or control of the SUBJECT PROPERTY or his various rental properties, including bills relating to ownership, possession, or maintenance; addressed correspondence; receipts, etc.;

F. access, use, ownership, or control of computers, storage media, or ESI found in or on the SEARCH SUBJECTS, including contextual information relating to the same;

G. internet access associated with the SUBJECT OFFENSES or MERRYMAN;

H. the identity or location of aiders and abettors of the SUBJECT OFFENSES;

I. All images, messages, communications, and contacts, including any and all preparatory steps taken in furtherance of the SUBJECT OFFENSES or to evade detection or apprehension after their commission;

J. Evidence indicating how and when the SUBJECT ACCOUNT was owned, controlled, accessed, or used, to determine the geographic and chronological context of such ownership, control, access, use, and of events relating to the SUBJECT OFFENSES and to the Account owner/user;

K. Evidence indicating the Account owner/user's state of mind as it relates to the SUBJECT OFFENSES;

L. The identity of the person(s) who created, used, or communicated with the SUBJECT ACCOUNT, including records that help reveal the whereabouts of such person(s).

M. Credit card and other financial information, including but not limited to, bills and payment records evidencing ownership of the SUBJECT ACCOUNT;

N. All images, messages and communications regarding wiping software, encryption or other methods to avoid detection by law enforcement; and

-3-

O. Passwords and encryption keys, and other access information that may be necessary to access the SUBJECT ACCOUNT and other associated accounts.

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

-4-

**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA**

*Newport News Division*

FILED

JAN 1 7 2024

CLERK U.S. DISTRICT COURT
NEWPORT NEWS, VA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF: | |
| THE BUSINESS PROPERTY LOCATED AT 10 RANHORNE COURT, HAMPTON, VIRGINIA; | Case No. 4:24sw 00007 |
| THE PERSON OF DAVID LEE MERRYMAN; | Case No. 4:24sw 00008 |
| INFORMATION ASSOCIATED WITH THE VERIZON.NET ACCOUNT MGMDD@VERIZON.NET STORED AT PREMISES CONTROLLED BY YAHOO INC. | Case No. 4:24sw 00009 |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

I, Theodore Y. Roese, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION

1.      I make this affidavit pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(a), (b)(1)(A), and (c)(1)(A), in support of applications for search warrants related to violations of 42 U.S.C. § 3631 (Interference with Housing) and 18 U.S.C. §§ 641 (Theft of Government Property), 875 (Interstate Communications with Threats to Injure), 1010 (False Statement to HUD), 1028A (Aggravated Identity Theft), 1343 (Wire Fraud), including attempting or conspiring to commit the same or aiding and abetting the commission thereof (collectively the "SUBJECT OFFENSES").

2.      I have probable cause to believe that the SUBJECT OFFENSES were committed by David Lee Merryman (MERRYMAN) and others known and unknown to law enforcement, as set forth herein, including at or using his business property (10 Ranhorne Court, Hampton, Virginia, hereinafter the SUBJECT PROPERTY) and his cellphones, computers, and other electronic devices and accounts, including as facilitated using the Verizon.Net account MGMDD@VERIZON.NET (the SUBJECT ACCOUNT), an online communications platform owned and operated by Yahoo. Inc., an electronic communications service and/or remote computing service provider headquartered at 770 Broadway, 9th Floor, New York, New York, and with an address for service of legal process of 391 San Antonio Road, 5th Floor, Mountain View, California 94040, (hereinafter the "Service Provider").

3.    Specifically, I seek warrants authorizing the following:

| Attachments | Search Target | Description (further set forth in Attachments A-1 to A-4) |
|---|---|---|
| A-1; B | SUBJECT PROPERTY | 10 Ranhorne Court, Hampton, Virginia, and any/all curtilage, including all vehicles, containers, and outbuilding(s) therein; |
| A-2; B | MERRYMAN PERSON | MERRYMAN is a white man born in 1965, assigned a Social Security number ending in 1810, and is depicted in Attachment A-2. |
| A-3; C | SUBJECT ACCOUNT | Information, including the contents of communications, associated with the Verizon.net Account MGMDD@VERIZON.NET stored at premises controlled by Yahoo Inc. |

4.    As to the Service Provider, this affidavit is made in support of an application for a warrant under 18 U.S.C. §§ 2703(a), (b)(1)(A), and (c)(1)(A), requiring the Service Provider to disclose to the Government copies of the information in its possession, including the contents of communications, further described in Section I of Attachment C, which will be reviewed by authorized persons to locate the items described in Section II of Attachment C.

5.    Based on my knowledge, training, experience, and information received in this case, I submit that there is probable cause to believe that MERRYMAN and others known and unknown to law enforcement committed the SUBJECT OFFENSES and to search MERRYMAN's business property and person, including devices recovered from them, and the SUBJECT ACCOUNT (collectively "SEARCH SUBJECTS," all further described in Attachments A-1 through A-3) for evidence, fruits, instrumentalities, and contraband of those crimes further described in Attachments B and C.

## JURISDICTION

6.    This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## AGENT BACKGROUND

7.    I have been a Special Agent with the Federal Bureau of Investigation (FBI) since July, 2004, and am currently assigned to the FBI's Norfolk Division, more specifically to FBI Norfolk Squad 5, an investigative unit that specializes in civil rights investigations (including violations generally referred to as hate crimes), as well as investigations often referred to as "white collar," including wire fraud and identity theft. I completed basic agent training at the FBI's training academy at Quantico, Virginia, in 2004, including training on the execution of federal search warrants. During the course of my career, I was assigned to four different field offices (Cleveland, Ohio; New York, New York; El Paso, Texas; Norfolk, Virginia), and in each of those assignments except for New York I was specifically assigned to conduct civil rights investigations, including hate crimes. I completed a US Department of Justice - Civil Rights Division-sponsored training program at the National Advocacy Center. From 2015 through 2020, while in Norfolk, I

served as the Supervisory Senior Resident Agent for the Peninsula Resident Agency in Newport News, Virginia, and served as the division's Civil Rights program coordinator.

8.    In connection with these roles, I have either led, supervised, or otherwise been involved with a wide range of hate crime investigations, an element of which is evidence of bias motivation. Such evidence is often manifest in digital media, as text messages, email, and social media platforms continue to gain favor as the mechanism by which bias motivation is communicated. As such, investigations involving digital evidence such as wire fraud and identity theft are routinely conducted in association with hate crimes investigations, and I have led, supervised, or otherwise been involved with many such investigations. These investigations often utilized, and I have significant experience with many investigative methods, including: physical surveillance; recruiting and managing informants; debriefing defendants and witnesses, including and especially vulnerable victim witnesses; and the handling and maintenance of evidence. Finally, I have testified before federal grand juries and in federal and state court. I am authorized to investigate and make arrests involving violations of federal law, and to execute warrants issued under the authority of the United States.

9.    From my knowledge, training, experience I know that individuals who commit crimes like those addressed herein often secrete or conceal evidence of their crimes in their businesses, vehicles, or other locations closely associated with them and under their control. Searches of those locations often reveal evidence, instrumentalities, contraband, and/ or fruits of the crimes under investigation, including related physical and electronic communications (e.g. files, letters, email/text messages with co-conspirators, victims, or institutions). Evidence commonly stored in business locations or in these devices and/or electronic records commonly maintained in business locations (e.g. time-stamped receipts, financial and employment records, photos/videos) often reveals identity, device, location, travel, and purchase information and therefore may corroborate witness statements and other relevant evidence.

10.    In particular, I know that electronic devices, particularly those connected to the internet like smartphones, are not only a common and essential feature of daily life, but they are also items of value, so suspects often keep such items in areas under their immediate control, such as on their persons, or in their vehicles or business locations. Searches of electronic devices, accounts, and electronically-stored information ("ESI") contain a similar scope of evidence as residences, particularly since many such devices are capable of taking photographs and videos and communicating with others in real time. Further, searches of ESI and devices can provide crucial chronological and geographic context due to the manner in and the frequency with which they interact with each other and service providers.

11.    Based on my knowledge, training, experience, and information received in this and other investigations, I know that individuals who commit crimes like those addressed herein often record and communicate evidence of their criminal activity. Messages, posts, emails, and recordings and other types of files are often stored or sent privately and may therefore be unknown to investigators. Device and network identifiers and the location capabilities of vehicles, cellphones, and other devices may be useful to corroborate witness testimony. They also maintain contact lists, including lists of friends and/or followers of social media and other applications. Such

evidence is essential in identifying any unknown or suspected co-conspirators, aiders/abettors or witnesses/victims not otherwise known to the investigation.

12.     I further know from my knowledge, training, experience, and information received from other law enforcement, that:

a.     Cellular devices, such as mobile telephones, are wireless devices that enable their users to send and receive wire and/or electronic communications using the networks provided by cellular service providers. To send or receive communications, cellular devices connect to radio antennas that are part of the cellular network called "cell sites," which can be mounted on towers, buildings, or other infrastructure. Cell sites provide service to specific geographic areas, but the service area of a given cell site will depend on many factors, including the distance between towers. As a result, information about what cell site a cellular device connected to at a specific time can provide the basis for an inference about the general geographic location of the device at that point.

b.     Many cellular devices such as mobile telephones have the capability to connect to wireless internet ("Wi-Fi") access points if a user enables Wi-Fi connectivity. Wi-Fi access points, such as those created through the use of a router and offered in places such as homes, hotels, airports, and coffee shops, are identified by a Service Set Identifier ("SSID") that functions as the name of the Wi-Fi network. In general, devices with Wi-Fi capability routinely scan their environment to determine what Wi-Fi access points are within range and will display the names of networks within range under the device's Wi-Fi settings.

c.     Many cellular devices feature Bluetooth functionality. Bluetooth allows for short-range wireless connections between devices; for example, a mobile device and Bluetooth-enabled headphones. Bluetooth uses radio waves to allow the devices to exchange information. When Bluetooth is enabled, a mobile device routinely scans its environment to identify Bluetooth devices. That device emits beacons which can be detected by mobile devices within the Bluetooth device's transmission range to which it might connect.

d.     Many cellular devices, such as mobile telephones, include global positioning system ("GPS") technology. Using this technology, the phone can determine its precise geographic coordinates. If permitted by the user, this information is often used by apps installed on a device as part of the app's operation.

13.     The facts in this Affidavit come from my observations, knowledge, training, and experience, and from information that I have learned, directly or indirectly, from witnesses, records, and information from other law enforcement officers. Unless otherwise indicated, conversations related herein are described in substance and part rather than verbatim. Likewise, I have not included each and every fact known to me but rather  only those necessary to show probable cause. This Affidavit is intended to show merely that there is probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## DEFINITIONS AND TECHNICAL TERMS

14. The term "computer" is defined in 18 U.S.C. § 1030(e)(1) and includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including devices like desktop computers, laptops/notebook computers, mobile phones, tablets, server computers, and network hardware.

15. "Computer passwords and data security devices," consist of information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates what might be termed a digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the process to restore it.

16. "Internet Protocol Address" (IP Address) refers to a unique numeric address used by computers on the Internet. Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Devices can have IP addresses that are "dynamic," meaning assigned a different unique number every time it accesses the Internet, or "static," meaning assigned a long-term, unchanging number.

17. "Internet Service Providers" (ISPs) are commercial organizations which provide individuals and businesses access to the Internet, often together with a range of other functions, including web hosting, e-mail, remote storage, and co-location of computers and other communications equipment. ISPs can offer various means by which to access the Internet and typically charge a fee based upon the type of connection and volume of data, called "bandwidth," that the connection supports. Many ISPs assign each subscriber an account name such as a username or screen name, an e-mail address, and an e-mail mailbox, and the subscriber typically creates a password for the account.

18. "Log Files" are records automatically produced by computer programs to document electronic events that occur on computers. Computer programs can record a wide range of events including remote access, file transfers, log-on/log-off times, and system errors. Logs are often named based on the types of information they contain. For example, web logs contain specific information about when a website was accessed by remote computers; access logs list specific information about when a computer was accessed from a remote location; and file transfer logs list detailed information concerning files that are remotely transferred.

19. The terms "records," "materials," and "information" include all forms of creation or storage - including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies) - in whatever form they are found and includes draft

-5-

versions or modifications that may have been created or stored in any electrical, electronic, or magnetic form. One form in which the records might be found is data stored on a computer's hard drive or other storage media, thus the requested warrant would authorize the search and seizure of "electronically stored information" ("ESI") under Federal Rule of Criminal Procedure 41(e)(2)(B). Rule 41 drew from the "broad and flexible" description of ESI in Federal Rule of Civil Procedure 34, which itself includes "writings, drawings, graphs, charts, photographs, sound recordings, images, and other data or data compilations," regardless of form or need for translation.

20.    The term "storage medium" includes any physical object upon which computer data can be recorded, such as hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

21.    "Website" consists of textual pages of information and associated graphic images. The textual information is stored in a specific format known as Hyper-Text Mark-up Language and is transmitted from web servers to various web clients via Hyper-Text Transport Protocol.

## MERRYMAN BACKGROUND AND PRESENT INVESTIGATION

### *Personal and Business Background*

22.    In or around the 1980s, MERRYMAN entered the rental property business when he inherited some rental properties from his father at the time of his father's passing. By late 2023, according to city records, MERRYMAN owned more than 60 rental properties in and around the Virginia Peninsula, many of which were included in the properties utilized by the federal housing assistance program commonly referred to as "Section 8."

23.    DAVID MERRYMAN is a Hampton, Virginia, native and resides on Chesapeake Avenue, in Hampton, which is in the Eastern District of Virginia. He is the sole owner of Merryman Grounds Maintenance, Inc. ("MGM"), a Virginia business incorporated on or about March 27, 1995. MERRYMAN is the president of MGM and serves as its registered agent, and the SUBJECT PROPERTY is its registered office address. MERRYMAN is the only officer or director listed for the business in its annual filings with the Virginia State Corporation Commission. According to marketing for the business, MGM sells a wide variety of landscaping services to customers.

24.    While MERRYMAN moved his business operations to a location in Newport News, Virginia, for a few years, he moved back to Hampton several years ago, and has used 10 Ranhorne Court (the SUBJECT PROPERTY) as his business property ever since. The SUBJECT PROPERTY is located in an industrial part of Hampton and is suitable for the many heavy-duty vehicles and pieces of heavy equipment MERRYMAN has and uses in support of his business. Doing business as MGM, MERRYMAN previously held contracts with commercial clients such as BJ's Wholesale and Lowe's to maintain the landscaping and grounds around their stores in and around Southeast Virginia.

25.    MERRYMAN owns approximately 23 rental properties in Hampton, Virginia, and approximately 39 rental properties in Newport News, Virginia. MERRYMAN primarily owns these properties in his individual capacity and runs his landlord business as a sole proprietorship.

However, he uses employees and resources of MGM in support of his landlord business and commingles assets between the two businesses.

26.     In or about 2014, MERRYMAN was convicted in *United States v. Merryman*, 4:14-cr-047, of a violation of 18 U.S.C. § 1001 related to making false statements pursuant to a U.S. Department of Labor investigation, for which MERRYMAN was alleged to have falsely claimed federal unemployment benefits. On January 30, 2015, he was sentenced to one month imprisonment and three years of supervised release, together with $5,000 in fines and more than $27,000 in restitution. He violated his supervised release, which was first revoked in July 2016. He was sentenced to time served following by 12 months of supervised release. He was again found to have violated his supervised release in October 2017, which was again revoked. He was sentenced to two months imprisonment with no additional term of supervised release. Many of the alleged violations and addenda detailed allegations of behavior relating to additional crimes like assaults or bribery.

27.     There was also a related civil case, *Walsh et al. v. Merryman Grounds Maintenance, Inc., et al.*, 4:14-cv-93, resulting in a 2014 consent judgment. Merryman was held in contempt twice, in or about February 2019 and in or about May 2022. In connection with the second contempt finding, MERRYMAN spent approximately six weeks in jail, during which time essentially all of his MGM clients discontinued doing business with him.

28.     In or about November of 2019, MERRYMAN made racist threats against an African-American Newport News city official, resulting in a televised standoff between the two at Newport News City Hall, for which the official was suspended. In or around August of 2021, MERRYMAN was expelled from the Section 8 program, with program administrators citing – among other things – abusive language on MERRYMAN's part towards tenants and program administrators, and failure to maintain properties to the required standards. In or about October, 2021, the Virginia Attorney General filed an $8 million lawsuit against MERRYMAN based on allegations of discriminatory housing practices. That lawsuit is still pending.

29.     A joint FBI/HUD-OIG investigation was initiated in March 2022, which case is summarized in the indictment being presented to the grand jury charging violations of the SUBJECT OFFENSES in January 2024, attached as Exhibit 1. The information in that indictment is accurate to the best of my knowledge, information, and belief and is incorporated herein.

30.     MERRYMAN has a long history of failing to maintain his properties in compliance with state and local regulations and offering properties for rent that are structurally unsound and without functioning heat and plumbing. Notwithstanding the poor condition of his properties, he continues to offer them for rent, primarily to low-income African American tenants with few other options who are marginally housed or vulnerable to homelessness. Once he has such an applicant, he charges them particularly high initial fees, deposits, and rent, even requiring several months' rent be prepaid in some cases. He then subjects these same tenants to verbal harassment and threats, racial slurs, and other discriminatory practices in part so they will leave the property, and he can start the cycle again.

31.     MERRYMAN's primary personal bank accounts were with Langley Federal Credit Union (account ending 6098) and Navy Federal Credit Union (account ending 8036). MERRYMAN's personal accounts reflect deposits and withdrawals of approximately $572,000 and $570,000 respectively in or about 2020, approximately $689,000 and $616,000 respectively in or about 2021, and approximately $411,000 and $406,000 respectively between in or about January and October 2022.

32.     MERRYMAN's primary business account for Merryman Grounds Maintenance, Inc., was with Langley Federal Credit Union (last four digits 0308). Deposits for Merryman Grounds Maintenance, Inc., were approximately $673,041 in or about 2020, approximately $498,906 in or about 2021, and approximately $269,686 from in or about January through October 2022.

### *Background on Emergency Rental Assistance Program*

33.     As a result of the COVID-19 pandemic, the United States made certain benefits available to help struggling tenants and landlords affected by the national health crisis, establishing two Emergency Rental Assistance (ERA) programs.

34.     In 2021, as part of the Consolidated Appropriations Act, the United States provided $25 billion to assist eligible households with financial assistance and housing stability services.

35.     Later in the American Rescue Plan Act of 2021, the United States provided $21.55 billion to help eligible households with financial assistance, provide housing stability services to cover the costs of affordable rental housing and eviction prevention activities.

36.     The United States provided ERA funds to state and local governments to distribute to applicants in their jurisdictions who were experiencing a financial hardship, were at risk of housing instability, and after meeting certain income requirements, affected by the pandemic and in need of rent relief payments. This program was administered by the Department of the Treasury, and grantees handled applications and individual eligible household disbursements in their localities. Grantees were expected to employ reasonable fraud prevention and validation procedures and required to comply with reporting and auditing obligations. The Treasury Office of the Inspector General (Treasury OIG) was ordered to conduct oversight by monitoring the disbursement and use of funds, and where it determined that grantees had not complied with the provisions governing the use of funds, it was authorized to recoup those funds to be reallocated to other grantees. Congress allocated up to $10,500,000 to the Treasury OIG for these oversight and recoupment duties.

37.     In Virginia, ERA funds were primarily distributed as part of the Virginia Rental Relief Program (RRP) through two organizations: Virginia Housing, formerly known as Virginia Department of Housing and Community Development (VHDA), and the Virginia Department of Housing and Community Development.

38.     VHDA is a not-for-profit organization created by the Commonwealth of Virginia in 1972 to help Virginians attain quality, affordable housing. VHDA does so, in part, by providing

-8-

mortgages, primarily for first-time homebuyers and developers of quality rental housing, which it funds by raising money in the capital markets. VHDA also teaches homeownership classes and helps elderly tenants and those with disabilities make their homes more livable. Since its founding, VHDA has financed more than 240,000 single-family home loans and 170,000 multifamily loans.

39.     During the pandemic, VHDA distributed rent relief benefits in Virginia, more than approximately 99% of which were funded by the federal government. Specifically, the VHDA received and distributed more than $137 million in federal funds from the Department of the Treasury and more than $77 million from the Department of Housing and Urban Development for the Housing Choice Voucher Program in Fiscal Year 2022. By contrast, it received and distributed approximately $1.5 million in funds from the Commonwealth of Virginia for rent relief.

40.     As part of the application for ERA and RRP funds, landlords like MERRYMAN completed and submitted required paperwork in which they certified the accuracy of the applications and that they complied with the rules and regulations of the ERA and RRP programs. Tenants are required to sign and complete certain portions of the application, but landlords remain responsible for verifying the information therein.

41.     The VHDA emailed MERRYMAN on or about December 8, 2020, and directed him as a beneficiary of the program to think of himself as "the reviewer who is responsible for showing that this is COVID related, there was a loss of income and they could not pay rent, and there is no fraud happening."

### *Scheme and Artifice to Defraud*

42.     From in or about 2015, through the present, MERRYMAN created a scheme and artifice to defraud and obtain money and property by making various materially false pretenses, representations, and promises. The objects of the scheme and artifice included, but were not limited to, the following:

a.     to obtain by fraud rent relief benefits from VHDA made available by the Commonwealth of Virginia and United States as a result of the COVID-19 pandemic;

b.     to obtain by fraud large initial payments in the form of security deposits, prepaid rent, and other fees, however construed, from prospective tenants by advertising, holding out, or implying that he would lease the rentals for longer tenancy terms when he had the true intention to evict them as quickly as possible to generate additional profit by restarting the cycle to collection additional high initial payments from new tenants; and

c.     to offer for rent homes that were in poor repair or failed to meet even basic standards of habitability by targeting vulnerable African American tenants, and to make false promises to repair them prior to the tenants' taking possession or to reimburse tenants for repair expenses they incurred, all while refusing to actually make the repairs or reimburse expenses, frequently using racially-based and discriminatory justifications for his refusals.

43.     MERRYMAN was aided and abetted by others known and unknown to law enforcement in carrying out these schemes and in committing the SUBJECT OFFENSES.

44.     MERRYMAN aided and abetted by others known and unknown, used the names and other personally identifying information (PII) of tenants to apply for rent relief benefits without the consent of the tenant applicants.

45.     MERRYMAN eschewed written agreements with tenants to prevent them from obtaining utilities or other claim to his properties while also facilitating his own ability to evict or otherwise condemn properties at will.

46.     MERRYMAN, aided and abetted by others known and unknown, acted to further the scheme to obtain by fraud rent relief payments to which he was not entitled by fabricating entire copies of lease documents that did not exist that he and his aiders and abettors, filled out with often incorrect information related to the tenants, and backdated documents before forging his tenants' signatures and otherwise falsely represented himself as authorized to act on behalf of his tenants on applications for rent relief benefits, leases, addenda to leases, and other necessary documentation.

47.     MERRYMAN, aided and abetted by others known and unknown, made false representations about the rent and fees due and owing from the tenant-applicants on the rent relief applications.

48.     MERRYMAN, aided and abetted by others known and unknown, made false representations in written applications about the tenant-applicants residing in the subject properties during the time periods at issue.

49.     MERRYMAN obtained the rent relief benefits without telling tenants, used the money for himself, and later evicted the same tenants for purportedly unpaid rent.

50.     MERRYMAN purposely rented to vulnerable, minority tenants with poor credit history and limited other options for housing.

51.     MERRYMAN required prospective tenants to make significant upfront payments to move into his properties, which payments included or were (sometimes falsely or fraudulently) labeled as, among other things, application fees, security deposits, and advance rent payments.

52.     MERRYMAN would falsely promise prospective tenants that he would make repairs to the properties at issue to induce them to pay the significant upfront payments.

53.     MERRYMAN would falsely promise tenants that he would credit their rent if they expended funds to repair the properties to induce them to pay for such repairs themselves.

54.     MERRYMAN would routinely fail to repair the properties or credit tenants' rent for repairs made or paid for by the tenants.

-10-

55.     MERRYMAN, having obtained significant upfront payments, would engage in racist and discriminatory harassment of tenants and would otherwise pressure tenants to leave the properties, so he could start the fee-collection cycle again.

56.     MERRYMAN used his harassment of specifically African American tenants to enrich himself at the expense of his victims and their basic habitability and enjoyment of the occupancy of their homes.

57.     MERRYMAN pressed many tenants to pay rent in U.S. currency and refused to provide confirmatory receipts, which facilitated him demanding more than the agreed upon rent amount and evicting tenants even when they had paid rent.

58.     MERRYMAN caused electronic transfers of information via wire communication in interstate commerce in furtherance of the scheme to occur between locations in the Eastern District of Virginia and terminals and/or computer servers located outside the Commonwealth of Virginia, including relating to negotiating money orders, applying for rent relief payments via the VHDA website, and using CashApp, a mobile device-based money transmitting application.

### *Facts and Circumstances Relating to Individual Tenant-Victims and Others*

#### *E.P.*

59.     E.P. is an African American woman who, in or about July 2015, rented a single-family home located at *** 31st Street, Newport News, Virginia, from MERRYMAN. E.P. lived in this home until she was evicted by MERRYMAN in or about August 2021.

60.     E.P. regularly paid MERRYMAN rent from 2015 until she was laid off from her job in 2021 during the pandemic and suffered some medical problems resulting in her hospitalization. Specifically, E.P. fell behind on her rent in the summer of 2021. While E.P. was hospitalized or soon thereafter, MERRYMAN sent a crew to remove all her belongings from her home and had her car towed. E.P. lost all her belongings in the house.

61.     On or about May 10, 2021, MERRYMAN, aided and abetted by others known and unknown, applied to the VHDA for approximately $15,100.00 in rent relief benefits for E.P. at *** 31st Street in Newport News, Virginia, 23607. E.P. did not know about, consent to, or otherwise authorize or benefit from this application. MERRYMAN, aided and abetted by others known and unknown, used E.P.'s name and forged her signature on the rent relief application, all without her consent.

62.     MERRYMAN falsely represented to the VHDA that E.P. owed back rent beginning as early as June 2020 through August 2021. MERRYMAN further submitted a fabricated residential lease agreement and an addendum to renew and extend the lease, wherein he again forged E.P.'s signature and used E.P.'s name without her consent.

63.     Despite obtaining approximately $15,100.00 rent relief benefits for E.P. from the VHDA, MERRYMAN evicted E.P. anyway, citing her unpaid rent. In total, MERRYMAN filed

-11-

three legal actions to evict E.P., which have continued to affect E.P. and prevent her from obtaining housing to this day.

64. While E.P. rented a home from MERRYMAN, he repeatedly interfered with her right to lease and occupy the dwelling. For instance, when the plumbing backed up into the house, MERRYMAN said it was "probably her weave." MERRYMAN then told E.P. to "clean the house like when you were slaves." MERRYMAN repeatedly called E.P. and her family "n*****s" and "trash."

65. In or about 2017, after MERRYMAN refused to repair the property and continued to harass E.P., she told MERRYMAN that he should leave or he would get what's coming to him. MERRYMAN became enraged and responded by retrieving a tire iron, and advancing on E.P., brandishing the tire iron as if he was going to strike her with it, while saying, "who's going to get what?"

66. Also, during her tenancy, two of what E.P. described as MERRYMAN's "enforcers" came to demand rental money from E.P. Both men pursuing E.P. for rent money were not only armed but also brandished firearms and acted in a threatening and hostile manner toward E.P. While brandishing a firearm, one of the men told E.P. that it was time to "pay the big man."

### *C.T.*

67. C.T. is an African American man who, in or about June 2018, rented a single-family home located at **** 30th Street, Newport News, Virginia, from MERRYMAN. C.T. prepaid ten months of rent to move in the home totaling approximately $10,000.00. When C.T. moved in, doors were missing, the water heater was broken, and the air conditioning did not work. MERRYMAN promised to repair the property and further said he would credit C.T.'s rent for any repairs he made himself or for which he paid contractors to make.

68. C.T. paid a contractor to fix the water heater. He also had his father travel from Philadelphia to fix the air conditioner. When C.T. asked to deduct these costs from the rent in accordance with MERRYMAN's promise when getting him to sign the lease, MERRYMAN called C.T. a "n*****" and claimed he was going to raise the rent to $1,450.00 per month.

69. After C.T. had made these and other reasonable requests to be reimbursed for repairs to MERRYMAN's property, MERRYMAN began making unannounced visits to the property, including inside the home in violation of state and local ordinances.

70. When C.T. requested that MERRYMAN fix the air conditioner, MERRYMAN justified his refusal to make the repair by saying, "y'all should be used to that . . . you're black. You can take the heat a little bit." When C.T. continued to request that MERRYMAN fix the air conditioning, MERRYMAN threatened his life.

71. On or about August 23, 2018, MERRYMAN made an unannounced visit to the house. C.T. asked him to leave. MERRYMAN became enraged and swung a lawn mower at C.T.

MERRYMAN then picked up a shovel, and while calling C.T. a "n*****," hit C.T. in the face with the shovel.

72.     MERRYMAN had C.T. evicted by falsely claiming he had not paid rent. C.T. did not have records to substantiate his prepayment of rent, so he was forced to vacate the property.

### *J.N. and M.E.*

73.     J.N. is an African American man. M.E. is an African American woman, who in or about April 2018, rented a single-family home located at **** 30th Street in Newport News, Virginia from MERRYMAN. When J.N. moved in, raw sewage was leaking into the home, light fixtures were broken, the tile in the bathroom was cracked, the house was infested with rodents, and the floor was rotting so badly that it caused J.N. to fall through the floor into the crawl space and injure himself. MERRYMAN promised to repair the property in inducing J.N. and M.E. to lease from him.

74.     After J.N. and his family moved in, when he made reasonable requests to repair the property, MERRYMAN responded by saying things like, "you fix it yourself. Get off your butt and go to work and get a job, you black n*****."

75.     The sewage backing into the house had a foul odor. J.N. requested that MERRYMAN repair the plumbing. MERRYMAN not only again refused to repair it but also responded by threatening J.N. saying he would beat J.N.'s "black ass" if he had to come over to the house.

76.     After the flooring problems worsened and MERRYMAN refused to repair them, J.N. reported the issues to the Newport News Department of Codes Compliance ("Codes Compliance"), the local agency charged with protecting the health, safety, and general welfare of the public through the administration and uniform enforcement of laws and regulations related to land use, building construction and property maintenance. Codes Compliance enforces the state's building code, the state's property maintenance code, and the city's zoning ordinances.

77.     In response to J.N.'s report, Codes Compliance inspected the condition of the property and found a number of violations. MERRYMAN attempted to speak to the inspector for Codes Compliance during the inspection, but the inspector continued to document violations at the property. This enraged MERRYMAN, and he physically assaulted J.N. by checking his shoulder into J.N.'s body during the inspection.

78.     During the time J.N. resided at **** 30th Street from in or about April 2018 through December 2020, he consistently paid his monthly rent.

79.     In or about December 2020, MERRYMAN, aided and abetted by others known and unknown, began working on an application for rent relief benefits for J.N. at the **** 30th Street address.

-13-

80.    On or about May 10, 2021, MERRYMAN submitted an application to the VHDA for approximately $12,150.00 in rent relief benefits for J.N. at the **** 30th Street address. J.N. did not know about, consent to, authorize, or otherwise benefit from this application. MERRYMAN assumed J.N.'s identity, using his personally identifying information on the rent relief application and signing the application as J.N. without his consent.

81.    In that application, MERRYMAN further falsely represented to the VHDA that J.N. continued to reside in the property through August 2021 and that he failed to pay rent for the period June 2020 through August 2021. MERRYMAN included a fabricated letter in the rent relief application from Outback Steakhouse that purported to lay off J.N.'s partner, M.E. The letter read: "G'Day Mate, we regretfully inform you, Ms. [M.E.], due to slower than usual business sales, we and most dining establishments will need to lay off wait staff until more business picks up." M.E. never worked at Outback Steakhouse.

82.    Another tenant, R.H. had moved into the property in or about February 2021 through the U.S. Department of Housing and Urban Development's Housing Choice Voucher Program ("Section 8"), as administered through the Newport News Redevelopment and Housing Authority ("NNRHA"). The NNRHA paid the majority of R.H.'s monthly rent payments beginning, in part, in February 2021 and continuing through at least January 2022.

83.    The Section 8 program prohibits owners from charging or accepting, from the family or any other source, any payment for rent of the unit in addition to the rent to owner. The ERA program similarly prohibits duplicative payments of any other federally funded rental assistance.

### _L.G._

84.    L.G. is an African American woman who, in or about the summer of 2018 to in or about the summer of 2019, rented the single-family home located at **** 41st Street in Newport News from MERRYMAN. When L.G. moved in, the property did not have a stove or a door on the refrigerator and needed to be treated for infestation by roaches and rodents. MERRYMAN promised to repair these problems to induce L.G. to rent the home, but never did so.

85.    When L.G. made reasonable requests to repair the property, MERRYMAN responded by calling L.G. a "n*****" and telling her that "you n*****s are always looking for something for nothing." MERRYMAN messaged L.G., "I have 23 people still owe me rent money from September, and Guess what!!!! They are all black!!!!" MERRYMAN frequently responded to L.G.'s basic housing requests with mocking, non-responsive messages like "black lives matter."

86.    After moving into the property, the HVAC system stopped working. When L.G. reported the problem to MERRYMAN, he accused her of stealing the HVAC unit.

87.    In response to L.G. continuing to make reasonable requests to repair the home she was renting, MERRYMAN became frustrated in or about April 2019, and his harassment culminated in a threat to turn L.G. and her "black ass kids" into "potting soil."

-14-

88.     L.G. sought and obtained a protective order against MERRYMAN. MERRYMAN responded to the order by, among other things, parking his vehicle just outside the prohibited radius of the order and making his presence known by staring at L.G. and her family.

### *V.L.*

89.     V.L. is an African American woman who, in or about March 2019, rented the single-family home located at *** Hickory Avenue, Newport News, Virginia, from MERRYMAN. When V.L. moved in, the house's roof leaked, windows and the air conditioner were broken, and it had plumbing issues that caused V.L to incur a water bill for approximately $1,000.00.

90.     MERRYMAN promised to fix the issues with the property when V.L. inquired about renting the property, as part of his attempt to induce her to lease the property, but he later refused to do so after she had moved in.

91.     While V.L. and her family were renting from MERRYMAN, the furnace caught fire and the fire department had to respond to put out the flames. MERRYMAN refused to help V.L. clean the house and remediate the smoke damage, which exacerbated her grandson's asthma.

92.     In or about December 2020, V.L. and her family purchased a home elsewhere and moved out of *** Hickory Avenue.

93.     On or about November 14, 2020, MERRYMAN applied to the VHDA for approximately $12,600.00 in rent relief benefits for V.L. at *** Hickory Avenue. The claimed rent relief benefits were for July 2020 through May 2021, which covered, in part, a period of time that V.L. did not live in the property.

94.     Another tenant, J.H., moved into the property in or about January 2021. The NNRHA paid the majority of J.H.'s monthly rent payments pursuant to the Section 8 program beginning, in part, in January 2021 and continuing through at least December 2021.

95.     V.L. was not aware of this application, did not consent to, authorize, or otherwise benefit from this application. MERRYMAN assumed V.L.'s identity, using her personally identifying information on the rent relief application and signed the application as J.N. without her consent.

### *H.R.*

96.     H.R. is an African American man. Since 2001, H.R. has been the Director of the City of Newport News Department of Codes Compliance. In that capacity, he supervises approximately forty-one employees, many of whom are inspectors who ensure that properties are safe and comply with land-use regulations and other applicable rules.

97.     MERRYMAN owns dozens of rental homes in areas of downtown Newport News that are required to have a property inspection and rental inspection certificate from H.R.'s office.

-15-

98.    MERRYMAN is known to Codes Compliance and its employes due to his having had a long history of rental properties with frequent and repeated failures to comply with the city's rules and regulations and to meet standards of relating to the condition and habitability of the property.

99.    In or about July 2020, MERRYMAN complained to H.R. about one of his inspectors and about receiving citations for failing to comply with the city's regulations. When H.R. advised MERRYMAN to seek advice from an attorney, MERRYMAN responded by e-mail, they're "having a BLM rally tonight" and "you wanna go[?]"

100.    In or about November 2019, MERRYMAN called H.R. to complain about his office condemning one of his properties because it was structurally compromised. When H.R. refused MERRYMAN's request to ignore the problems with the property, MERRYMAN complained that Codes Compliance should condemn a different property of his. H.R. refused because MERRYMAN had a history of having properties condemned to illegally evict tenants.

101.    On or about November 20, 2019, MERRYMAN's harassment of H.R. in his capacity as an employee escalated again. MERRYMAN was angry about Codes Compliance condemning one of his properties. H.R. told MERRYMAN that he could not be verbally abusive to his staff and that MERRYMAN was not going to raise his voice at him. In response, MERRYMAN threatened H.R. that he would "beat [his] n***** ass." MERRYMAN then came to City Hall and confronted H.R. in the lobby of the building as he was leaving work, trying to goad him into starting a fight.

### Ty.B.

102.    Ty.B. is an African American woman who, in or about December 2019, rented a single-family home located at **** 41st Street in Newport News from MERRYMAN. The majority of Ty.B.'s rent was paid by the NNRHA through the Section 8 program. For MERRYMAN to be eligible to receive payments from NNRHA for Ty.B., the property had to meet certain requirements relating to the condition of the property ("Housing Quality Standards").

103.    The Housing Quality Standards for Section 8-assisted properties are published at Title 24, Code of Federal Regulations (CFR) § 982.401. The CFR states that, "All program housing must meet the HQS performance requirements both at commencement of the assisted occupancy, and throughout the assisted tenancy." Among other things, the Housing Quality Standards require that the dwellings have an oven, and a stove or range, and a refrigerator of appropriate size for the family. Dwellings must have and be capable of maintaining a thermal environment healthy for the human body. There must be a safe system for heating the dwelling unit (and a safe cooling system, where present). The system must be able to provide adequate heat (and cooling, if applicable), either directly or indirectly, to each room, in order to assure a healthy living environment appropriate to the climate.

104.    Additionally, the Housing Quality Standards require that the dwelling unit must be structurally sound. The structure must not present any threat to the health and safety of the occupants and must protect the occupants from the environment. The ceilings, walls, and floors

-16-

must not have any serious defects such as severe bulging or leaning, large holes, loose surface materials, severe buckling, missing parts, or other serious damage. The roof must be structurally sound and weathertight. The exterior wall structure and surface must not have any serious defects such as serious leaning, buckling, sagging, large holes, or defects that may result in air infiltration or vermin infestation. Further, the unit must be in sanitary condition and be free of vermin and rodent infestation.

105.    Ty.B.'s rental home was in very poor condition, and needed a lot of work at the time she moved in. She typically would not have rented the property in the condition it was in, but she had a new daughter and needed a place to live quickly. MERRYMAN told Ty.B. that if she paid for the work that the house needed, he would deduct what she paid from the rent. Ty.B. said at the time she moved in, there was a plumbing leak in the bathroom, and the ceilings leaked when it rained. Ty.B. stated the heat and air conditioning worked on the first day she lived in the property, but never worked again after that. She had to purchase space heaters and air conditioning window units with her own money. Additionally, the planks on the front porch were "popping," and there were no locks on the doors.

106.    On or about December 3, 2019, MERRYMAN executed a Housing Assistance Payments (HAP)·Contract with the NNRHA. Among other things, MERRYMAN certified that as the owner of the property he would maintain the contract unit and premises in accordance with the Housing Quality Standards. The HAP Contract stated, "Unless the owner has complied with all provisions of the HAP contract, the owner does not have a right to receive housing assistance payments under the HAP contract."

107.    In documentation submitted to the NNRHA, MERRYMAN made a number ·of material, false representations to obtain housing benefit payments. He falsely represented that the property had a functioning heating and cooling system, a working oven, microwave, washing machine, dryer, garbage disposal, ceiling fans, a dishwasher, and a driveway. In fact, as MERRYMAN then and there well knew, the property did not have a microwave, a garbage disposal, a washer and dryer, ceiling fans, or a driveway. The "Proposed Section 8 Unit Information" form showed that the property was built in 1983. According to the Newport News Real Estate Assessment website, the property was built in 1930. At the bottom of the Proposed Section 8 Unit Information form, MERRYMAN falsely characterized it, in summary, as a "Very Nice."

108.    In reality, when Ty.B. moved into the property, it was in poor condition. In fact, the NNRHA's inspection of the property on December 3, 2019, noted several items that failed and needed to be corrected. Those items included, correcting the cause of a water leak that resulted in water stains, correcting floor tripping hazard at the front entrance, correcting the cause for water leaking underneath kitchen sink, correct GFI switch that does not function.

*S.F.*

109.    S.F. is a white woman who, in or about December 2019, S.F. rented the single-family home located at ** Salem Street, Hampton, Virginia, 23669, from MERRYMAN. S.F.'s best friend was African American, which caused MERRYMAN to call her a "n**** lover"

-17-

regularly. S.F. asked MERRYMAN what race had to do with it. MERRYMAN responded, "cause all my white people are paying me and 18 n*****s aren't."

110.    S.F., at the time, had been employed in security services for a hotel. In or about the summer of 2020, S.F. lost her employment as a result of the COVID-19 pandemic.

111.    Without steady pay, S.F. fell behind on her rent. MERRYMAN began to direct racially-based harassment at S.F., telling her things such as, "F that you're still working and you're white, don't give me that n***** shit."

112.    In or about August 2020, S.F. delivered a stillborn child. In the wake of this traumatic event, MERRYMAN sent S.F. the following messages:

| | |
|---|---|
| MERRYMAN | Your chosen to be a n*****<br>That's ok<br>You'll see who the real n***** is |
| S.F. | Are you threatening me?! |
| MERRYMAN | Take it how you want to n*****<br>The cops have been there a total of 9 times since you've lived there |
| S.F. | That's a lie |
| MERRYMAN | Your and your crazy wife are the real problem |
| S.F. | I'm done arguing with ignorance I'll see you in court |
| MERRYMAN | Lol ok<br>Just like a n*****<br>Pay your bills like other white people<br>But then again you have a bunch of n***** friends it seems like<br>So maybe you're a n***** lover<br>Kinda funny when you don't have any roommates you run out of money .......<br>Also maybe god was given you karma for the death of your baby for treating your landlord and old roommates badly |

113.    In or about the fall of 2020, S.F. attempted to apply to VHDA for rent relief benefits. Her application was denied because she needed certain documentation from MERRYMAN such as a ledger of rent payments that she did not have and he would not give her.

114.    MERRYMAN wanted to apply for more rent relief payments and demanded S.F. work for him or face eviction. S.F. agreed to do so.

-18-

115.    S.F. struggled to compile applications for MERRYMAN's properties because he did not have the necessary paperwork like leases and ledgers of rent payments for his properties.

116.    S.F. worked in MERRYMAN's office at the SUBJECT PROPERTY where he had sticky notes on the wall that said, "don't attack anybody today, you can't go back to jail."

117.    S.F. contacted tenants to have them sign rent relief applications for MERRYMAN, but they refused. Some of the tenants refused to consent because they did not trust MERRYMAN. Others did not want to see MERRYMAN compensated by the government for properties in such poor condition. S.F. then witnessed MERRYMAN forge a rent relief application.

118.    On or about June 22, 2021, MERRYMAN applied to the VHDA for approximately $8,800.00 in rent relief benefits for S.F. at the ** Salem Street address. S.F. was not aware of this application, did not consent to, or otherwise benefit from this application. MERRYMAN assumed S.F.'s identity, using her personally identifying information on the rent relief application and forging her signature the application, all without her consent. MERRYMAN misspelled S.F.'s name on the rent relief application.

*F.D.*

119.    F.D. is an African American woman who, in or about April 2020, F.D. rented the single-family home located at *** 18th Street in Newport News from MERRYMAN. The property was in terrible condition. When F.D. moved in, there were stains on the carpeting, a clogged sink full of water, a clogged toilet full of human waste, a ceiling light hanging by the wires, and broken windows. Before moving in, F.D. had only seen the outside of the property, which seemed fine. When she moved in, she found all of these problems. When she asked MERRYMAN about them, he told her to take him to court.

120.    In or about the winter of 2021, F.D. lost her job as a housekeeper in Colonial Williamsburg because of the COVID-19 pandemic. She fell behind on her rent.

121.    MERRYMAN engaged in a campaign of harassment to intimidate F.D. He would call to harass F.D., call her a "black n*****," and "black bitch." He made generalized references to black women with comments like, "you black bitches, you all get here and don't pay your money, you're getting out of here."

122.    In or about October 19, 2020, MERRYMAN's threatened F.D. with a string trimmer. MERRYMAN came to F.D.'s home and called her phone. MERRYMAN demanded rent and refused to repair the property as requested by F.D. When F.D. opened the front door, she observed MERRYMAN wielding the string trimmer, which was on at the time. MERRYMAN threatened F.D., saying "what are you going to do you black bitch, what you going to do now? I'm here, you can't do nothing with me."

123.    In or about November 2020, F.D. worked with MERRYMAN to complete an application for rent relief benefits from the VHDA. He never communicated to her whether he received any benefits or submitted the application. On or about May 10, 2021, MERRYMAN

applied to the VHDA for approximately $13,770.00 in rent relief benefits for F.D. at the *** 18th Street address.

124.    On the benefit application submitted on or about May 10, 2021, MERRYMAN falsely represented that F.D. had not paid rent from in or about July 2020 through in or about June 2021. This was untrue. MERRYMAN continued to demand F.D. make payments to him during this period.

125.    Despite obtaining rent relief benefits for F.D. from the VHDA, MERRYMAN evicted F.D., citing her unpaid rent for the same period. This was in violation of the Landlord Agreement section of the Rent Relief application, which required MERRYMAN to agree, "I acknowledge and agree to the requirement that I must not evict the renter for non-payment of the rent associated with any of the months for which the rent relief payment is made."

126.    The rent relief benefits MERRYMAN received for F.D. were for the time-period July 2020 through September 2021. Concurrent with F.D.'s eviction, MERRYMAN received a judgment against her for $20,400 plus late fees totaling $2,047 and attorney fees of $5,610. The judgment covered 17 months of F.D.'s rent payments, including at least seven that MERRYMAN already received rent relief benefits for.

### E.S.

127.    E.S. is an African American man who owns a concrete construction business based in Hampton, Virginia. He has worked in the concrete construction business for more than 40 years.

128.    Individual 1 hired MERRYMAN to build a new driveway, but he failed to complete the job in a timely fashion. MERRYMAN excavated Individual 1's old driveway, but he did not build a new one. Individual 1 hired E.S. to finish the job and construct his new driveway.

129.    On or about July 8, 2020, shortly after E.S. finished the project for Individual 1, he received a call from a phone number ending in 2700. MERRYMAN identified himself on the call. MERRYMAN repeatedly threatened E.S., stating "You stole, you stole my job, n*****, and I will kill your ass, n*****. I'm going to take you to court for stealing my job, n*****."

130.    MERRYMAN was not satisfied with the above threats, though, and he immediately called back to threaten him another time, telling E.S. to "watch your back, n*****, because I'm going to kill your n***** ass."

131.    E.S. was worried for his safety, so he sought and obtained a protective order against MERRYMAN. Notwithstanding that order, in or about March 2021, MERRYMAN came to a different jobsite where E.S. was working and stared at him and his team, which violated the protective order obtained by E.S.

132.    After MERRYMAN threatened E.S. in July 2020, he did not bid on or work jobs where MERRYMAN was involved for fear that MERRYMAN would kill him.

*E.D. and A.D.*

133.   E.D. is an African American woman, and A.D. is an African American man. In or about October 2020, E.D. and A.D. rented a single-family home located at *** 17th Street in Newport News from MERRYMAN. When E.D. and A.D. moved in, the floor was at risk of collapsing and there was a sizeable hole in the floor into the crawl space under the house. The home also had mold that caused respiratory issues for the minor daughter of E.D. and A.D.

134.   E.D. and A.D. repeatedly asked MERRYMAN to repair the property to make it habitable. MERRYMAN refused and belittled E.D. and A.D by using racial slurs.

135.   In or about December 2020, E.D. and A.D. vacated the property out of concern of the health issues their minor daughter was experiencing because of the mold.

136.   After E.D. and A.D. left the property, they were contacted by a representative of MERRYMAN who asked them to sign paperwork for rent relief benefits. They refused to do so, as they did not want to see him unfairly compensated for the property.

137.   On or about May 10, 2021, MERRYMAN applied to the VHDA for approximately $9,700.00 in rent relief benefits for E.D. and A.D. at the *** 17th Street address. Neither E.D. nor A.D. consented to, authorized, or otherwise benefited from this application. MERRYMAN assuming the identity of E.D. and A.D., using their names and forging their signatures on the rent relief application, all without their consent.

138.   After E.D. and A.D. refused to apply for rent relief, MERRYMAN mocked them and told them that he was "still getting his money" by applying for rental assistance with our without their consent.

*E.M.*

139.   E.M. is an African American woman who, in or about 2021, MERRYMAN hired to help him apply for rent relief benefits from VHDA. E.M. was a landlord herself and had had success applying for rent relief benefits in that capacity and as an advisor to others.

140.   MERRYMAN bragged to E.M. about using a backhoe to evict tenants illegally by removing the waterline to condemn properties. Because all residences must have running water to be habitable, by removing the property's access to running water, MERRYMAN made it uninhabitable and could trigger its near automatic condemnation.

141.   E.M. reviewed MERRYMAN's business records in connection with facilitating various rent relief applications, E.M. observed MERRYMAN's practices as a landlord. For instance, E.M. found notes in his business files about which tenants had "Black Lives Matter" signs and indications that MERRYMAN would attempt to damage or remove them.

142. Moreover, E.M.'s review of MERRYMAN's files revealed deficiencies in his recordkeeping. Many of his property files did not contain leases, addenda to renew leases, rental ledgers, or other basic documentation.

143. MERRYMAN agreed to pay E.M. a percentage commission for the rent relief benefits she obtained for his properties, but he did not follow through on that promise. MERRYMAN paid E.M. approximately $14,000.00 for her work, but that was not the full sum of the money he owed her.

144. E.M. asked MERRYMAN what to do if she could not reach his tenants or if they refused to sign the rent relief paperwork. He directed her to falsify the paperwork and submit the applications anyway. One at least one occasion, E.M. witnessed MERRYMAN forge a tenant's signature on a rent relief application. On another occasion, MERRYMAN directed E.M. to put together a rent relief application for a property where he was already paid, in part, with rent subsidies from the Section 8 program.

### *J.I.*

145. J.I. is an African American woman who, in or about August 2021, rented a single-family home located at *** Blair Avenue, Newport News, Virginia 23607 from MERRYMAN. J.I.'s rent was paid, in part, by the NNRHA through the Section 8 program, which meant that property was required to meet Housing Quality Standards.

146. On or about July 21, 2021, MERRYMAN executed a Housing Assistance Payment (HAP) Contract with the NNRHA, which included his certifying that as the owner of the property he would maintain the contract unit and premises in accordance with the Housing Quality Standards.

147. In documentation submitted to the NNRHA, MERRYMAN made a number of material, false representations to obtain housing benefit payments. He falsely represented that the property had a functioning heating and cooling system, a working oven, microwave, washing machine, and dishwasher. In fact, as MERRYMAN then and there knew, the appliances did not function as he represented. At the bottom of the Proposed Section 8 Unit Information form, MERRYMAN falsely characterized it, in summary, as a "very nice house." On the form, MERRYMAN reported that the house was built in 1978 and renovated in 2021. According to the City of Newport News, the property was built in 1920.

148. In reality, when J.I. moved into the property, it was in poor condition. In addition to the non-functioning appliances described above, there were vermin in the attic and numerous dangerous structural issues, including a rotting floor, the front porch resting on unsteady cement blocks, cracks in the foundation, and exposed insulation.

149. To induce J.I. to rent the premises, MERRYMAN promised to repair these issues and make the property habitable, but he did not do so. The NNRHA later began to withhold rent benefits from MERRYMAN because he did not complete the necessary repairs per the terms of the contract, including within the specified time period.

150.    As a result of his anger related to the withheld NNRHA funds, MERRYMAN began harassing J.I. and otherwise interfering with her living at the property, including her reasonable, quiet enjoyment of the same. He threatened to shut off the utilities. He entered the property without her consent. He made disparaging, false comments that she was lazy and needed to work for a living because she was eligible for housing assistance. When J.I. would explain how his assumptions were incorrect, he would brush her off with comments like "black lives matter."

### T.D.

151.    T.D. is an African American woman who, in or about November 2019, rented the single-family home located at **** 16th Street in Newport News. T.D. had previously rented the same unit a few years prior from MERRYMAN, and did not want to return, but felt compelled to do so because she had limited options for housing.

152.    When T.D. moved in, there was mold throughout the house and exposed wiring. When T.D. made reasonable requests to MERRYMAN to repair the property, he responded with comments like, "y'all black people never want to pay rent." In 2020, T.D. lost her job during the pandemic. When she informed MERRYMAN, he said, "That's why I'm putting you n*****s out."

153.    T.D. attempted to apply for rent relief benefits from VHDA herself. When she notified MERRYMAN, he told her to bring the application to his office (at the SUBJECT PROPERTY). After reviewing the paperwork, he offered to hire T.D. and pay her $20 per hour to work on rent relief applications for his other properties. When T.D. reviewed MERRYMAN's business records (at the SUBJECT PROPERTY), she found that many of the properties did not have leases or other basic documentation. MERRYMAN directed T.D. to "make leases for the properties." MERRYMAN also directed T.D. to forge the signatures of tenants on the leases. When T.D. refused to do so, MERRYMAN told T.D. he would forge the signatures himself. T.D. worked for approximately 40 hours on rent relief applications for MERRYMAN, but he never compensated her for those hours worked, despite promising to do so.

### E.W.

154.    In or about December 2019, E.W., an African American woman, rented the single-family home located at *** Glendale Road in Hampton from MERRYMAN. The Glendale Road house was in serious disrepair when E.W. took possession. Among other things, the toilet in the bathroom did not work, there was a hole in the wall patched with paper plate, and bricks were falling off the house. MERRYMAN promised to repair the property or credit E.W.'s rent for any repairs she made herself.

155.    When E.W. asked MERRYMAN to make reasonable repairs to the property after she had moved in, he responded with mocking comments and attempted to evict her by condemning the property.

156.    When E.W. was unsuccessful at getting the repairs MERRYMAN had promised, she called Codes Compliance about the condition of the property. When they put violation stickers

on the home, MERRYMAN illegally removed them. MERRYMAN also became angry when he learned that E.W. called Codes Compliance on him, so he destroyed the waterline to the house with a backhoe.

157.    On or about May 10, 2021, MERRYMAN, aided and abetted by others known and unknown, applied to the VHDA for approximately $18,000.00 in rent relief benefits for E.W. at *** Glendale Road, Hampton, Virginia 23661. E.W. did not consent to, authorize, or otherwise benefit from this application. MERRYMAN assumed E.W.'s identity, using her name and forging E.W.'s signature on the rent relief application, all without E.W.'s consent.

158.    The final application submitted contained several mistakes making it clear that it was evident that MERRYMAN and not E.W. completed the application. For instance, MERRYMAN misspelled E.W.'s own name on the rent relief application and misstated her age. MERRYMAN also wrongly listed her as having a dependent child in the residence. MERRYMAN falsely represented to the VHDA that E.W. lost her job at a restaurant during the pandemic. In fact, E.W. did not work for a restaurant.

### Ta.B.

159.    Ta.B. is an African American woman who, in or about January 2021, rented a single-family home located at **** 30th Street in Newport News from MERRYMAN. All of Ta.B.'s rent was paid by the NNRHA through the Section 8 program. For MERRYMAN to be eligible to receive payments from NNRHA for Ta.B., the property had to meet Housing Quality Standards relating to the condition of the property.

160.    Contrary to the Housing Quality Standards, the house was infested with rodents and neither the heat nor the air conditioning worked. In fact, the rodents got so bad, Ta.B. had to move her family to a hotel.

161.    On or about January 14, 2021, MERRYMAN caused the execution of a HAP Contract with the NNRHA on his behalf. Among other things, MERRYMAN, aided and abetted by others known and unknown, certified that the property met and would be maintained in accordance with the Housing Quality Standards. In documentation submitted to the NNRHA, MERRYMAN made a number of material, false representations to obtain housing benefit payments. He falsely represented that the property had a functioning heating and cooling system, a stove and a refrigerator. In fact, as MERRYMAN then and there knew, the property did not have a functioning heating and cooling system, stove or refrigerator. The Proposed Section 8 Unit Information form showed that the property was built in 1980. According to the Newport News Real Estate Assessment website, the property was built in 1940. At the bottom of the Proposed Section 8 Unit Information form, MERRYMAN falsely characterized it, in summary, as a "Very Nice Unit."

### J.P.

162.    J.P. is a Puerto Rican man who identifies as Hispanic and is married to an African American woman. In or about September 2022, J.P. rented the single-family home located at ****

Shell Road in Hampton from MERRYMAN. When J.P. moved in, the cabinets were infested with cockroaches. There was no stove or refrigerator. The carpets were dirty. There was black mold in the house. And the water heater was broken.

163. MERRYMAN told J.P. he would repair the property when J.P. was deciding whether to lease from him, but after J.P. moved in, MERRYMAN refused to make the requested repairs. When J.P. asked for repairs after moving into the property, MERRYMAN became frustrated and made comments like calling J.P. a "n**** lover" (a reference to his African American wife).

164. On or about December 13, 2022, J.P. went to MERRYMAN's office to make a reasonable request that he fix the hot water heater. MERRYMAN violently refused, telling J.P. to "get the f*** out" and throwing an Allen wrench at him.

165. MERRYMAN then grabbed a chainsaw and threatened J.P. MERRYMAN cranked the chainsaw as if he was going to use it on J.P. MERRYMAN struck J.P. with the blade of the saw (while it was off) approximately four times while calling J.P. a "n*****," "sp*c," "dumb mother f*****," and "crackhead."

### S.M.

166. S.M. is an African American woman who, in or about December 2022, rented single-family home located at **** 42nd Street in Newport News from MERRYMAN. When S.M. moved into the 42nd Street property, sewage was backing up into the home, there was no functioning bathroom in the home, the sink was leaking, and there were holes in the exterior of the home to the outside.

167. While inducing S.M. to lease the property, MERRYMAN made materially false representations to her that he would repair the property before she moved in. In reliance on those false representations, S.M. paid MERRYMAN $4,500.00 in upfront costs to move into the property. The subsequent monthly rent was approximately $1,350.00.

168. S.M. soon withheld paying rent because there were so many issues with the property, including the repairs MERRYMAN had failed to make, notwithstanding his earlier promises. MERRYMAN refused to fix anything but still demanded to be paid rent. For instance, on one occasion, he came to the house and told S.M. they needed to reach an understanding about the rent. While prominently displaying a firearm on his lap, MERRYMAN demanded that S.M. sign a promissory note to pay him rent. Fearing for her life, S.M. did so. When S.M. made reasonable requests to repair the property, MERRYMAN called S.M. a "n****," made discriminatory comments about "y'all n*****s," and made comments about how "you people don't work" and want to "live off welfare."

169. MERRYMAN subsequently sued to evict S.M. He called demanding rent and S.M. told MERRYMAN to speak to her attorney. MERRYMAN responded threateningly, "Watch. You're going to see. You're going to see what's going to happen." MERRYMAN said he would turn off the water and call the authorities to take away S.M.'s children.

<u>G.G.</u>

170.    G.G. is an African American man who, in or about October 2022, rented the single-family home located at *** Vaughan Avenue in Hampton from MERRYMAN. When G.G. and his family first saw the home, there was no functioning stove, no working refrigerator, the bathroom tub had a hole, the bathroom mirror was broken, and the shower drain was badly stained. MERRYMAN falsely promised G.G. that he would repair the problems to induce G.G. to sign a lease and pay him upfront fees, including an initial deposit of approximately $1,000 on or about October 14, 2022, a move-in deposit of approximately $1,600.00 on or about October 27, 2022, and a combination of rent/deposit of approximately $1,150.00 on or about November 9, 2022. All of these payments by G.G. to MERRYMAN were sent through the mobile payment service, CashApp, which is an application available to be used on cellphones or other devices.

171.    When G.G. made reasonable requests to repair the property, MERRYMAN responded with comments like, "you people, man, it's always the black ones that got to have the problem with moving in." He also made non-responsive comments about "black lives matter" when discussing basic housing requests.

172.    In or about February 2023, MERRYMAN made an unannounced visit to the property with a crew of approximately five men. Without knocking on the door or otherwise notifying G.G. of their presence, MERRYMAN and the crew of men went into the backyard and began retrieving a pile of bricks and disassembling bricks that had been arranged as a fire pit. When G.G. confronted MERRYMAN about the unannounced visit, he became angry. When G.G. asked MERRYMAN why he would spend time on the bricks as opposed to fixing some of the more serious problems in the house, he responded, "man, these freaking black people, they always want something extra, man." When G.G. came closer, MERRYMAN asked one member of his crew, "hey, you still got your gun on you?" The man said he did and stood next to MERRYMAN with his hand behind his back, as if he was ready to draw the weapon. Afraid he would be shot or attacked, G.G. retreated back in the house briefly before coming outside again. MERRYMAN went over to the firepit and retrieved a brick, which he threateningly waved at G.G. while saying, "you black motherf******. Y'all always want something." As MERRYMAN departed the property, he yelled, "f***ing n*****s, f***ing n*****s."

173.    A few weeks after the above incident, G.G. and his wife went to MERRYMAN's office (the SUBJECT PROPERTY) to obtain a copy of his lease. MERRYMAN had turned off the electricity to the property, and G.G. needed a lease to have the utilities in his name. Rather than turn over the lease, MERRYMAN became angry and gestured as if he was going to retrieve a firearm from his desk. Victim G.G.'s wife fled the office in fear. G.G. challenged MERRYMAN and asked if he was seriously going to shoot him. Instead of a firearm, MERRYMAN retrieved a barbeque lighter from the desk.

### *Merryman's Deposition and Additional Investigation*

174.    On December 8, 2023, MERRYMAN sat for a deposition pursuant to the Virginia Attorney General's lawsuit. While under oath for that deposition, MERRYMAN confirmed

information gained through the investigation, information that establishes probable cause to believe that evidence of the SUBJECT OFFENSES will be located at the SUBJECT PROPERTY, on MERRYMAN's person, and on the SUBJECT ACCOUNT and seized devices.

175.    MERRYMAN conducts the vast majority of business-related administrative work at the SUBJECT PROPERTY, as witnessed by his employees, who also report seeing him keep records at that location.

176.    Likewise, numerous victim-tenants, employees, and other witnesses outline witnessing MERRYMAN conducting significant portions of his business (and harassment) via his telephones (observed to be late-model iPhones) using numbers 757-435-2700 and 757-651-0244 and internet access, including access to the SUBJECT ACCOUNT to send and receive emails in connection with the SUBJECT PROPERTY and his rental properties, including emails with tenants, employees, and organizations like NNHRA and Codes Compliance. The SUBJECT ACCOUNT is the only email account known to investigators to be used by MERRYMAN, which has been corroborated by at least two non-law-enforcement witnesses.

177.    In addition to the e-mails (and text messages outlined herein, there are numerous emails between MERRYMAN and NNHRA or Langley Federal Credit Union using the SUBJECT ACCOUNT relating to the SUBJECT OFFENSES. Specifically, the investigation determined, and MERRYMAN confirmed under oath, information about both physical and electronic records, including the information in the following paragraphs.

178.    *Property binders and other rental property-related records*: While it understood that MERRYMAN's property binders are often incomplete (i.e. lacking current copies of leases, maintenance logs, rent payments ledgers, and other records commonly associated with a rental property management business), multiple employee witnesses identified, and MERRYMAN confirmed under oath, that MERRYMAN's primary form of rental property recording keeping is his "property binders" (one or more for each of the rental properties he owns). Through investigation and as confirmed by MERRYMAN's sworn testimony, it is known to investigators that his binders reside at the SUBJECT PROPERTY, and generally do not move from that location. Multiple employee witnesses, including MERRYMAN's estranged wife, who worked as a de facto property manager for MERRYMAN for a time, identified to the investigation that other business records, such as those related to employees of the business, taxes, and physical and electronic records of communications with tenants, employees, and city officials are all maintained at the SUBJECT PROPERTY. Such records support each of the suspected violations.

179.    *Electronic Devices and the SUBJECT ACCOUNT*: As outlined in witness accounts and MERRYMAN's sworn testimony, MERRYMAN characteristically keeps his two phones on his person and uses both, together with the SUBJECT ACCOUNT given that his phones are internet-enabled cellphones (smartphones), regularly during the conduct of his business.

      a.    MERRYMAN's conspicuous "for rent" signs list one of his numbers.

-27-

b.      In his deposition, MERRYMAN identified that his primary mechanism of recording rent payments and communicating receipts of rent payments to his tenants is sending text messages using his known phones.

c.      MERRYMAN testified that when he files eviction proceedings with the courts, he uses the text messages on his phone as evidence of payment or nonpayment.

d.      He further stated that he has receipt books at his business property, and "some" ledgers on the SUBJECT COMPUTER, but he admitted under oath that he did not know which time periods his ledgers covered, or even which computer program was used to create those ledgers.

e.      Further, during the course of MERRYMAN's deposition, he was asked about multiple racist text message exchanges he initiated with former tenants. His testimony confirms that he used his two known phones to initiate these exchanges, and that the text message exchanges about which he was asked under oath represent racist threats and intimidation directed at the tenants he was communicating with.

f.      Furthermore, since learning that he was the target of an FBI/HUD-OIG investigation in or about March 2023, MERRYMAN routinely sent text messages and made phone calls to your affiant using both of his known phone numbers, at least some of which tend to corroborate evidence of the SUBJECT OFFENSES gained from other sources. For example, on Friday, January 12, 2024, MERRYMAN sent your affiant text messages identifying that he filed "unlawful detainees [sic]" (i.e. eviction papers) against nine of his current tenants.

g.      At least one of these tenants provided your affiant the two different debt collection/eviction packages she received from MERRYMAN or on behalf of MERRYMAN. The tenant subsequently advised your affiant that despite multiple requests on her part, MERRYMAN refuses to provide her with a lease. She further stated that: the house she has been renting from MERRYMAN for nearly two years has never had heat or air conditioning, the sink leaks, and the stove does not work; her CashApp receipts demonstrate clearly that she does not owe the rent monies MERRYMAN claims she owes. MERRYMAN recently broke into the house through a window in order to intimidate her and asked a neighbor who is also MERRYMAN's tenant to contact her and try to get her to move out.

180.    Multiple witnesses alleged both that MERRYMAN is or was a regular user of illegal narcotics both at the SUBJECT PROPERTY and in his vehicles, and two witnesses independently observed MERRYMAN to be in possession of a firearm while conducting business in the vehicle he uses most regularly.

## BACKGROUND CONCERNING EMAIL

181.    In my training and experience, I have learned that an electronic communications service provider and/or remote computing service provider like Yahoo Inc. provides a variety of online services, including electronic mail ("email") access, to the public. Email providers allow subscribers to obtain email accounts at the domain names gmail.com, yahoo.com, verizon.com and

-28-

others, like the SUBJECT ACCOUNT. Subscribers obtain an account by registering with the email provider. During the registration process, the email provider asks subscribers to provide basic personal information. Therefore, the computers of the email provider are likely to contain stored electronic communications (including retrieved and unretrieved email for subscribers) and information concerning subscribers and their use of the email provider's services, such as account access information, email transaction information, and account application information. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

182. An email subscriber can also store with the provider files in addition to emails, such as address books, contact or buddy lists, calendar data, pictures (other than ones attached to emails), and other files, on servers maintained and/or owned by the email provider. In my training and experience, evidence of who was using an email account may be found in address books, contact or buddy lists, email in the account, and attachments to emails, including pictures and files.

183. In my training and experience, email providers generally ask their subscribers to provide certain personal identifying information when registering for an email account. Such information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative email addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number). In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users. Based on my training and my experience, I know that, even if subscribers insert false information to conceal their identity, this information often provides clues to their identity, location, or illicit activities.

184. In my training and experience, email providers typically retain certain transactional information about the creation and use of each account on their systems. This information can include the date on which the account was created, the length of service, records of log-in (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account. In addition, email providers often have records of the IP address used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the email account.

185. In my training and experience, in some cases, email account users will communicate directly with an email service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. Email providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or user.

-29-

186.    As explained herein, information stored in connection with an email account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. It may also contain information as to the location of some of the subjects. In my training and experience, the information stored in connection with an email account can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, email communications, contacts lists, and images sent (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the account at a relevant time. Further, information maintained by the email provider can show how and when the account was accessed or used. For example, as described below, email providers typically log the addresses from which users access the email account, along with the time and date of that access. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the email account access and use relating to the crime under investigation. This geographic and timeline information may tend to either inculpate or exculpate the account owner. Additionally, information stored at the user's account may further indicate the geographic location of the account user at a particular time (e.g., location information integrated into an image or video sent via email). Last, stored electronic data may provide relevant insight into the email account owner's state of mind as it relates to the offense under investigation. For example, information in the email account may indicate the owner's motive and intent to commit a crime (e.g., communications relating to the crime), or consciousness of guilt (e.g., deleting communications in an effort to conceal them from law enforcement).

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

187.    As described herein and in Attachments B and C, this Affidavit supports Applications that seek permission to search for records that might be found on or in the SEARCH SUBJECTS, regardless of the form in which they are found. Because one form in which the records might be found is data stored on a computer's hard drive or other storage media, the requested warrant would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Federal Rule of Criminal Procedure 41(e)(2)(B).

188.    I submit that if a computer or storage medium is found on or in the SEARCH SUBJECTS there is probable cause to believe those records will be stored on that computer or storage medium, based not only on the facts set forth elsewhere in this Affidavit, but also the known typical proximity of such devices to a target's person, residence, or vehicle, and on the following, which I know through my knowledge, training, experience, and discussions with others:

a.    Computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little to no cost. Even when such files have been deleted, they may be recoverable months or years later using forensic tools, because when a person "deletes" a file on a home computer, the data contained in the file does not actually disappear but rather remains on the storage medium until it is overwritten by new data. Therefore, deleted files, or remnants thereof, may reside in free or slack space – that is, in

space on the storage medium that is not currently being used by an active file – for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

b.       Wholly apart from user-generated files, computer storage media – in particular, internal drives – contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task, but it is technically possible to do so.

c.       Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache." Typically, the browser maintains a fixed amount of storage space devoted to these files, which are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve residue of an electronic file from a storage medium depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and habits.

189.    *Forensic Evidence*: As further described in Attachments B and C, these applications seek permission to locate not only records, including ESI, that might serve as direct evidence of the Subject Offense, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. Based on my knowledge, training, experience, and information from others, there is probable cause to believe that this forensic electronic evidence will be on any storage medium in the SUBJECT PROPERTY associated with MERRYMAN's business because:

a.       Data on storage media can provide evidence of a file that was once on the media but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on storage media that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b.       As explained herein, ESI within a computer or other electronic storage media (e.g., registry information, records of session times and durations, internet history, and anti-virus and malware detection programs) may provide crucial evidence of the "who, what, why, when, where, and how" of the Subject Offense, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. Such ESI can indicate who has used or controlled the computer or storage media, which "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

-31-

c.      Computer and storage media activity and the existence or absence of anti-virus, spyware, and malware detection programs may indicate how and when the computer or storage media was accessed or used and whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Such information – like user account session times, file creation information, geolocation information embedded into images, the IP addresses through which the device accessed networks and the internet, etc. – can help investigators understand the chronological and geographic context of the device or Subject Offenses conduct, which may tend to either inculpate or exculpate the owner of devices.

d.      Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating planning) or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

e.      A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

f.      I know that when an individual uses a computer to commit offenses like bank fraud, the computer will generally serve as an instrumentality of the crime and serve as a storage medium for evidence of the crime is used as a means of committing the offense:

190.    *Necessity of seizing or copying entire computers or storage media*: In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. While it is sometimes possible to "image" the storage media – a generally, taking a complete electronic picture of the computer's data, including all hidden sectors and deleted files – either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. Based on my knowledge, training, experience, and the information herein, this is true because of the following reasons:

a.      The time required for an examination. Not all evidence takes the form of documents and files that can be easily viewed on site, so analyzing evidence of how a computer has been used, for what purpose, and by whom requires considerable time, the passage of which on scene could be unreasonable. As explained above, because the warrant calls for forensic

electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media (which can store a large volume of information) to obtain evidence. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, which would be impractical and invasive to attempt on-site.

b.    Technical requirements. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools. Further, computers can feature a variety of operating systems, application software, and configurations, so searching them likewise sometimes requires tools or knowledge not present on site. The variety of devices and software also makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its ESI on site, but taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

191.    *Nature of examination*. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

## CONCLUSION

192.    Based on the information contained herein, I respectfully submit that probable cause exists to believe that MERRYMAN and others known and unknown committed, conspired/attempted to commit, or aided and abetted in the commission of the SUBJECT OFFENSES and to issue the requested warrants to search the SEARCH SUBJECTS described in Attachments A-1 to A-3 for evidence, fruits, instrumentalities, and contraband of the SUBJECT OFFENSES further described in Attachments B and C.

_____
Special Agent Theodore Y. Roese, FBI

This affidavit has been reviewed for legal sufficiency by Assistant U.S. Attorney Julie Podlesni.

Reviewed:    _____
Julie Podlesni
Assistant United States Attorney

Subscribed and sworn before me on January __17__, 2024, in the City of Newport News, Virginia.

_____
UNITED STATES MAGISTRATE JUDGE
Douglas E. Miller
United States Magistrate Judge

-33-

## ATTACHMENT A-1
## (SUBJECT RESIDENCE)
*Property to be searched*

The property to be searched is 10 Ranhorne Court, Hampton, Virginia, 23661, a business property for which the main office building is a grey siding and red brick, two-story building. The property is further described as having a perimeter surrounded by chain link fencing; a number of barns, sheds, and outbuildings; and approximately 18 vehicles plus multiple heavy equipment implements.

View of 10 Ranhorne Court from the intersection of Ranhorne Court and Salter's Creek Road, Hampton, Virginia. The direction of this view is approximately North to South.



View of 10 Ranhorne Court from the intersection of Ranhorne Court and Salter's Creek Road, Hampton, Virginia. The direction of this view is approximately North to South.



-1-

## ATTACHMENT A-2
## (SUBJECT PERSON)
*Person to be searched*

The person of **DAVID LEE MERRYMAN**, a white man approximately 5'11" tall and weighing approximately 210 pounds, born in 1965, and assigned a Social Security number ending in 1810, as pictured in the photograph below:



**ATTACHMENT A-3**
**(SUBJECT ACCOUNT)**
*Property to be searched*

This warrant applies to information associated with the SUBJECT ACCOUNT:

MGMDD@verizon.net

that is stored at premises owned, maintained, controlled, or operated by Yahoo Inc. ("Yahoo"), a company headquartered at 770 Broadway, 9th Floor, New York, New York, and with an address for service of legal process of 391 San Antonio Road, 5th Floor, Mountain View, California 94040, (hereinafter the "Service Provider").

-1-

## ATTACHMENT B
*Property to be Seized*

Without regard to form and incorporating the definitions and technical terms set forth in the accompanying Affidavit, all items, records, and information found in the Subject Residence or on the Subject Person relating to violations of the SUBJECT OFFENSES – *i.e.* 42 U.S.C. § 3631 (Interference with Housing) and 18 U.S.C. §§ 641 (Theft of Government Property), 875 (Interstate Communications with Threats to Injure), 1010 (False Statement to HUD), 1028A (Aggravated Identity Theft), 1343 (Wire Fraud), including attempting or conspiring to commit the same or aiding and abetting the commission thereof (collectively the "SUBJECT OFFENSES") – as set forth herein and in the accompanying Affidavit, together with contraband, fruits, and instrumentalities of the same, including the following:

1.  Items related to the SUBJECT OFFENSES and communications about the same;

2.  All physical records related to the SUBJECT PROPERTY and to MERRYMAN's rental properties, including any records related to: leases and lease agreements; properties; rent or other related payments, such as ledgers, invoices, and receipts; correspondence with and records pertaining to any related government authority such as city inspections, and applications and correspondence to local, state, and federal housing programs; correspondence with any tenant or prospective tenant; property tax records; maintenance logs, requests for service, invoices or estimates for services; purchase orders, credit and other account information

3.  Any biographic information such as facial recognition, fingerprints, DNA, as well as account user IDs, combinations, codes, passwords, or PINs as required to access any evidence subject to search as defined in Attachments A1 through A3.

4.  All employee/employment related records, including contracts, payroll records, employee identification information, timesheets, withholding and other tax records, communications between MERRYMAN and his employees, etc.

5.  Firearms and ammunition, as well as items pertaining to the possession of firearms and ammunition, including gun cases, ammunition magazines, holsters, spare parts for firearms, accessories (silencers, laser sights, etc.), firearms cleaning equipment, images of firearms or of persons in possession of firearms, and receipts for the purchase and/or repair of all these items;

6.  Items related to financial accounts, including the business and personal accounts set forth in the attached affidavit, and including bank statements and mailings from financial institutions, both in his name and in the name of others;

7.  United States or foreign currency, precious metals, jewelry, financial instruments including but not limited to checkbooks and debit and credit cards;

8.  Computers, storage media, or ESI used as a means to commit the SUBJECT OFFENSES, and records and information relating to the same;

9. Records, information, and items relating to the SUBJECT OFFENSES, including records, information, and items relating to:
   a. MERRYMAN's and MGM's properties and business, including the management of all rental properties;
   b. applications for rent relief payments and his knowledge of the related requirements;
   c. communications related to the advertisement or condition of his properties or to requests for repairs or reimbursements;
   d. Section 8 related communications;
   e. VHDA related communications,
   f. communications with tenants;
   g. communications regarding use of force within the context of his business or in connection with the race of the victim;
   h. discriminatory or harassing communications related to discriminatory bias in how he conducted his business; and
   i. communications related to the specific acts outlined in the attached affidavit, with all communications also including any preparatory efforts or efforts to conceal the same;
   j. communications as to MERRYMAN's state of mind with respect to engagement with law enforcement or legal process, including about the destruction or concealment of evidence or communications, witness tampering, retaliatory lawsuits, etc.;
   k. website access and search history related to the SUBJECT OFFENSES and related conduct;
   l. MERRYMAN's acquisition, possession, transfer, and disposition of firearms;
   m. financial records, including those showing the fruits of the SUBJECT OFFENSES;
   n. communications about the fraudulent and discriminatory schemes outlined in the attached Affidavit;
   o. access, use, ownership, or control of the SUBJECT PROPERTY or his other properties, whether in his, MGM's, or another business's name, including bills relating to ownership, possession, or maintenance; addressed correspondence; receipts, etc.;
   p. access, use, ownership, or control of computers, storage media, or ESI found in or on the SEARCH SUBJECTS, including contextual information relating to the same;
   q. internet access associated with the SUBJECT OFFENSES or MERRYMAN;
   r. the identity or location of suspect(s) of the SUBJECT OFFENSES;
   s. access, use, ownership, or control, including user identity, of accounts associated with the SUBJECT OFFENSES, including the SUBJECT ACCOUNT;
   t. knowledge, intent, or lack of mistake with respect to the SUBJECT OFFENSES, including communications regarding the planning, execution, and concealment thereof;
   u. the presence or absence and related operation or effect of antivirus software, malicious software, or software to remove, conceal, or destroy data (e.g. a "wiping" program).

10. For any computer, storage medium, or ESI whose seizure is otherwise authorized by this warrant, and any computer, storage medium, or ESI that contains, or in which is stored, records or information otherwise called for by this warrant (hereinafter "Device"), evidence of:
   a. who used, owned, or controlled the Device at the time the things described in this warrant were created, edited, or deleted, , including a reasonable amount of time before and after to establish necessary use and context evidence, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user

profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

b.  software (or the lack thereof) that would allow others to control the Device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect such software;

c.  how and when the computer was accessed or used to determine the chronological context of Device access, use, and events relating to the SUBJECT OFFENSES and to the Device user;

d.  the Device user's state of mind, knowledge, and intent relating to the SUBJECT OFFENSES;

e.  attachment of storage devices or similar containers for ESI to the Device;

f.  counter-forensic programs (and associated data) designed to eliminate data from the Device;

g.  evidence of the times the Device was used;

h.  passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the Device;

i.  documentation and manuals that may be necessary to access or conduct a forensic examination of the Device;

j.  records of or information about IP addresses used by the Device;

k.  records or information about the Device's Internet activity, including firewall logs; caches; browser history and cookies; "bookmarked" or "favorite" webpages; search terms the user entered into Internet search engines; and records of user-typed web addresses; and

l.  contextual information necessary to understand the evidence described in this Attachment.

11. Routers, modems, and network equipment used to connect Devices to the Internet.

As used herein (and as noted above), the terms "records," "information," "computer," "storage medium," "storage media," "ESI" all retain the definitions set forth in the Affidavit.

This warrant authorizes a review of Devices and ESI seized or copied pursuant to this warrant to locate evidence, contraband, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any Government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the Government, attorney support staff, and technical experts. Pursuant to this warrant, law enforcement may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the Government and their support staff for their independent review.

## ATTACHMENT C
*Particular Things to be Seized*

### I.    Information to be disclosed by Yahoo Inc. ("Yahoo")

To the extent that the information described in Attachment A-3 is within the possession, custody, or control of Yahoo, regardless of whether such information is located within or outside of the United States, and including any emails, records, files, logs, or information that has been deleted but is still available to Yahoo, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Yahoo is required to disclose the following information to the government for each account or identifier listed in Attachment A-3:

A. All business records and subscriber information, in any form kept, pertaining to the Account, including:

1. Identity and contact information (past and current), including full name, e-mail addresses, physical address, date of birth, phone numbers, gender, hometown, occupation, websites, and other personal identifiers;

2. All Verizon or Yahoo usernames (past and current) and the date and time each username was active, all associated Verizon and Yahoo accounts (including a list of linked accounts based upon IP address and session cookie), and all records or other information about connections with Yahoo, third-party websites, and mobile apps (whether active, expired, or removed);

3. All records or other information stored at any time by an individual using the account, including address books, contact and buddy lists, calendar data, pictures, and files;

4. Length of service (including start date), types of services utilized, purchases, and means and sources of payment (including any credit card or bank account number) and billing records;

5. Devices used to login to or access the account, including all device identifiers, attributes, user agent strings, and information about networks and connections, cookies, operating systems, and apps and web browsers;

6. All advertising information, including advertising IDs, ad activity, and ad topic preferences;

7. Internet Protocol ("IP") addresses used to create, login, and use the account, including associated dates, times, and port numbers, from **January 1, 2018**, to **present**;

8. Privacy and account settings, including change history; and

9. Communications between Yahoo and any person regarding the account, including contacts with support services and records of actions taken;

B. From **January 1, 2018**, to **present**, all content (whether created, uploaded, or shared by or with the Account), records, and other information relating to:

1. Communications sent from or received by the Account, including but not limited to:

   i. The content of all emails and any other communications sent from or received by the Account and all associated multimedia and metadata, including deleted and draft content if available;

   ii. All records and other information about other messages sent from or received by the Account, including dates and times, methods, sources and destinations (including usernames and account information), and status; and

   iii. All associated logs and metadata;

2. All records of searches performed by the account; and

3. All location information, including location history, login activity, information geotags, and related metadata.

Yahoo is hereby ordered to disclose the above information to the government within 14 days of the issuance of this warrant.

## II.    Information to be seized by the government

All information described above in Section I that constitutes fruits, contraband, evidence, and instrumentalities of violations of the Subject Offenses – *i.e.* 42 U.S.C. § 3631 (Interference with Housing) and 18 U.S.C. §§ 641 (Theft of Government Property), 875 (Interstate Communications with Threats to Injure), 1010 (False Statement to HUD), 1028A (Aggravated Identity Theft), 1343 (Wire Fraud), including attempting or conspiring to commit the same or aiding and abetting the commission thereof (collectively the "SUBJECT OFFENSES") – including for the SUBJECT ACCOUNT, information pertaining to the following matters:

A. All records or other information relating to MERRYMAN's and MGM's properties and business; applications for rent relief payments; financial transactions related to his rentals; communications related to the advertisement or condition of his properties or to request for repairs; Section 8 related communications; VHDA related communications, communications with tenants; communications regarding use of force within the context of his business or in connection with the race of the victim; discriminatory or harassing communications related to discriminatory bias in how he conducted his business; and communications related to the specific acts outlined in the attached affidavit, with all communications also including any preparatory efforts or efforts to conceal the same, as well as communications as to MERRYMAN's state of mind with respect to engagement with law enforcement or legal process, including about the destruction or concealment of evidence or communications, witness tampering, and to possession and use of other relevant evidence, including the SUBJECT PROPERTY, any related devices, relevant firearms, etc.;

-2-

B. All records related to the SUBJECT PROPERTY and to MERRYMAN's rental properties, including any records related to: leases and lease agreements; properties; rent or other related payments, such as ledgers, invoices, and receipts; correspondence with and records pertaining to any related government authority such as city inspections, and applications and correspondence to local, state, and federal housing programs; correspondence with any tenant or prospective tenant; property tax records; maintenance logs, requests for service, invoices or estimates for services; purchase orders, credit and other account information

C. Any biographic information such as facial recognition, fingerprints, DNA, as well as account user IDs, combinations, codes, passwords, or PINs as required to access any evidence subject to search as defined in Attachments A-1 through A-3.

D. All employee/employment related records, including contracts, payroll records, employee identification information, timesheets, withholding and other tax records, communications between MERRYMAN and his employees, etc.

E. Access, use, ownership, or control of the SUBJECT PROPERTY or his various rental properties, including bills relating to ownership, possession, or maintenance; addressed correspondence; receipts, etc.;

F. access, use, ownership, or control of computers, storage media, or ESI found in or on the SEARCH SUBJECTS, including contextual information relating to the same;

G. internet access associated with the SUBJECT OFFENSES or MERRYMAN;

H. the identity or location of aiders and abettors of the SUBJECT OFFENSES;

I. All images, messages, communications, and contacts, including any and all preparatory steps taken in furtherance of the SUBJECT OFFENSES or to evade detection or apprehension after their commission;

J. Evidence indicating how and when the SUBJECT ACCOUNT was owned, controlled, accessed, or used, to determine the geographic and chronological context of such ownership, control, access, use, and of events relating to the SUBJECT OFFENSES and to the Account owner/user;

K. Evidence indicating the Account owner/user's state of mind as it relates to the SUBJECT OFFENSES;

L. The identity of the person(s) who created, used, or communicated with the SUBJECT ACCOUNT, including records that help reveal the whereabouts of such person(s).

M. Credit card and other financial information, including but not limited to, bills and payment records evidencing ownership of the SUBJECT ACCOUNT;

N. All images, messages and communications regarding wiping software, encryption or other methods to avoid detection by law enforcement; and

-3-

O. Passwords and encryption keys, and other access information that may be necessary to access the SUBJECT ACCOUNT and other associated accounts.

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.



IN THE UNITED STATES DISTRICT COURT FOR THE
FOR THE EASTERN DISTRICT OF VIRGINIA

*Newport News Division*

| | |
|---|---|
| UNITED STATES OF AMERICA, | Criminal No. 4:24-cr-____ |
| v. | 18 U.S.C. §§ 1343 and 2<br>Wire Fraud<br>(Counts 1-10) |
| DAVID L. MERRYMAN, | |
| Defendant. | 42 U.S.C. § 3631 and 18 U.S.C. § 2<br>Interference with Housing<br>(Counts 11-14) |

18 U.S.C. §§ 875(c) and 2
Interstate Communications with Threats to
Injure
(Counts 15-16)

18 U.S.C. §§ 641 and 2
Theft of Government Money
(Counts 17-22)

18 U.S.C. §§ 1010 and 2
False Statement to Department of Housing
and Urban Development
(Counts 23-26)

18 U.S.C. §§ 1028A and 2
Aggravated Identity Theft
(Counts 27-30)

18 U.S.C. § 981(a)(1)(C) & 28 U.S.C. §
2461
Asset Forfeiture

INDICTMENT

January 2024 Term – at Newport News, Virginia

GENERAL ALLEGATIONS

At all times relevant to the Indictment:


GOVERNMENT
EXHIBIT
SW Ex. 1

The Defendant and Associated Business Entities

1.      DAVID MERRYMAN resided at **** Chesapeake Avenue, Hampton, Virginia, in the Eastern District of Virginia.  He was the sole owner of Merryman Grounds Maintenance, Inc.

2.      Merryman Grounds Maintenance, Inc., ("MGM") was a business that was incorporated in the Commonwealth of Virginia on or about March 27, 1995.  MERRYMAN was the president of MGM and served as its registered agent with a registered office address of ** Ranhorne Court, Hampton, Virginia 23661.  MERRYMAN was the only officer or director listed for the business in its annual filings with the Virginia State Corporation Commission.  According to marketing for the business, MGM sells a wide variety of landscaping services to customers.

3.      MERRYMAN owned approximately 23 rental properties in Hampton, Virginia, and approximately 39 rental properties in Newport News, Virginia.  MERRYMAN primarily owned these properties in his individual capacity and operated his landlord business as a sole proprietorship.  However, he used various employees and resources of MGM in support of his landlord business and commingled assets between the two businesses.

4.      MERRYMAN had a long history of failing to maintain his properties in compliance with state and local regulations and offering properties for rent that were structurally unsound and without functioning heat and plumbing.  Notwithstanding the poor condition of his properties, he continued to offer them for rent, primarily to low-income African American tenants with few other options who are marginally housed or vulnerable to homelessness.  Once he had obtained such an applicant, he charged them particularly high initial fees, deposits, and rent, even requiring several months' rent be prepaid in some cases.  He then subjected these same tenants to verbal harassment and threats, racial slurs, and other discriminatory practices in part so they will either refrain from

2

making complaints and/or taking action concerning the poor condition of the property, or even leave the property, and he can start the cycle again.

5. MERRYMAN's primary personal bank accounts were with Langley Federal Credit Union (account ending 6098) and Navy Federal Credit Union (account ending 8036). MERRYMAN's personal accounts reflect deposits and withdrawals of approximately $572,000 and $570,000 respectively in or about 2020, approximately $689,000 and $616,000 respectively in or about 2021, and approximately $411,000 and $406,000 respectively between in or about January and October 2022.

6. MERRYMAN's primary business account for Merryman Grounds Maintenance, Inc., was with Langley Federal Credit Union (last four digits 0308). Deposits for Merryman Grounds Maintenance, Inc., were approximately $673,041 in or about 2020, approximately $498,906 in or about 2021, and approximately $269,686 from in or about January through October 2022.

<u>Background on Emergency Rental Assistance Program</u>

7. As a result of the COVID-19 pandemic, the United States made certain benefits available to help struggling tenants and landlords affected by the national health crisis, establishing two Emergency Rental Assistance (ERA) programs.

8. First, in 2021, as part of the Consolidated Appropriations Act, the United States provided $25 billion to assist eligible households with financial assistance and housing stability services.

9. Second, in the American Rescue Plan Act of 2021, the United States provided $21.55 billion to help eligible households with financial assistance and provide housing stability services to cover the costs of affordable rental housing and eviction prevention activities.

3

10.    The United States provided ERA funds to state and local governments to distribute to applicants in their jurisdictions who were experiencing a financial hardship, were at risk of housing instability, and after meeting certain income requirements, affected by the pandemic and in need of rent relief payments. This program was administered by the Department of the Treasury, and grantees handled applications and individual eligible household disbursements in their localities. Grantees were expected to employ reasonable fraud prevention and validation procedures and required to comply with reporting and auditing obligations. The Treasury Office of the Inspector General (Treasury OIG) was ordered to conduct oversight by monitoring the disbursement and use of funds, and where it determined that grantees had not complied with the provisions governing the use of funds, it was authorized to recoup those funds to be reallocated to other grantees. Congress allocated up to $10,500,000 to the Treasury OIG for these oversight and recoupment duties.

11.    In Virginia, ERA funds were primarily distributed as part of the Virginia Rental Relief Program (RRP) through two organizations: Virginia Housing, formerly known as Virginia Department of Housing and Community Development (VHDA), and the Virginia Department of Housing and Community Development.

12.    VHDA is a not-for-profit organization created by the Commonwealth of Virginia in 1972 to help Virginians attain quality, affordable housing. VHDA does so, in part, by providing mortgages, primarily for first-time homebuyers and developers of quality rental housing, which it funds by raising money in the capital markets. VHDA also teaches homeownership classes and helps elderly tenants and those with disabilities make their homes more livable. Since its founding, VHDA has financed more than 240,000 single-family home loans and 170,000 multifamily loans.

4

13.    During the pandemic, VHDA distributed rent relief benefits in Virginia – more than approximately 99% of which were funded by the federal government.  Specifically, the VHDA received and distributed more than $137 million in federal funds from the Department of the Treasury and more than $77 million from the Department of Housing and Urban Development for the Housing Choice Voucher Program in Fiscal Year 2022.  By contrast, it received and distributed approximately $1.5 million in funds from the Commonwealth of Virginia for rent relief.

14.    As part of the application for ERA and RRP funds, landlords like MERRYMAN completed and submitted required paperwork in which they certified the accuracy of the applications and that they complied with the rules and regulations of the ERA and RRP programs.  Tenants are required to sign and complete certain portions of the application, but landlords remain responsible for verifying the information therein.

15.    The VHDA emailed MERRYMAN on or about December 8, 2020, and directed him as a beneficiary of the program to think of himself as "the reviewer who is responsible for showing that this is COVID related, there was a loss of income and they could not pay rent, and there is no fraud happening."

Scheme and Artifice to Defraud

16.    From in or about 2015, through at least the date of this Indictment, MERRYMAN created a scheme and artifice to defraud and obtain money and property by making various materially false pretenses, representations, and promises.  The objects of the scheme and artifice included, but were not limited to, the following:

a)    to obtain by fraud rent relief benefits from VHDA made available by the Commonwealth of Virginia and United States as a result of the COVID-19 pandemic;

5

b)     to obtain by fraud large initial payments in the form of security deposits, prepaid rent, and other fees, however construed, from prospective tenants by advertising, holding out, or implying that he would lease the rentals for longer tenancy terms when he had the true intention to evict them as quickly as possible to generate additional profit by restarting the cycle to collection additional high initial payments from new tenants; and

c)     to offer for rent homes that were in poor repair or failed to meet even basic standards of habitability by targeting vulnerable African American tenants, and to make false promises to repair them prior to the tenants' taking possession or to reimburse tenants for repair expenses they incurred, all while refusing to actually make the repairs or reimburse expenses, frequently using discriminatory justifications for his refusals.

17.     It was a part of the scheme and artifice that MERRYMAN, aided and abetted by others known and unknown, used the names and other personally identifying information (PII) of tenants to apply for rent relief benefits without the consent of the tenant applicants.

18.     It was further a part of the scheme and artifice that MERRYMAN, aided and abetted by others known and unknown, eschewed written agreements with tenants to prevent them from obtaining utilities or other claim to his properties while also facilitating his own ability to evict or otherwise condemn properties at will.

19.     It was further a part of the scheme and artifice that MERRYMAN, aided and abetted by others known and unknown, acted to further the scheme to obtain by fraud rent relief payments to which he was not entitled by fabricating entire copies of lease documents that did not exist that he and his aiders and abettors filled out with often incorrect information related to the tenants, and

6

backdated documents before forging his tenants' signatures and otherwise falsely represented himself as authorized to act on behalf of his tenants on applications for rent relief benefits, leases, addenda to leases, and other necessary documentation.

20. It was further a part of the scheme and artifice that MERRYMAN, aided and abetted by others known and unknown, made false representations about the rent and fees due and owing from the tenant-applicants on the rent relief applications.

21. It was further a part of the scheme and artifice that MERRYMAN, aided and abetted by others known and unknown, made false representations in written applications about the tenant-applicants residing in the subject properties during the time periods at issue.

22. It was further a part of the scheme and artifice that MERRYMAN, aided and abetted by others known and unknown, obtained rent relief benefits without telling tenants, used the money for himself, and later evicted the same tenants for purportedly unpaid rent.

23. It was further a part of the scheme and artifice that MERRYMAN purposely rented to vulnerable, minority tenants with poor credit history and limited other options for housing.

24. It was further a part of the scheme and artifice that MERRYMAN required prospective tenants to make significant upfront payments to move into his properties, which payments included or were falsely labeled as, among other things, application fees, security deposits, and advance rent payments.

25. It was further a part of the scheme and artifice that MERRYMAN would falsely promise prospective tenants that he would make repairs to the properties at issue to induce them to pay the significant upfront payments.

26.     It was further a part of the scheme and artifice that MERRYMAN would falsely promise tenants that he would credit their rent if they expended funds to repair the properties to induce them to pay for such repairs themselves.

27.     It was further a part of the scheme and artifice that MERRYMAN, having obtained significant upfront payments, would engage in racist and discriminatory harassment of tenants and would otherwise pressure tenants to leave the properties, so he could start the fee-collection cycle again.

28.     It was further a part of the scheme and artifice that MERRYMAN used his harassment of specifically African American tenants to enrich himself at the expense of his victims and their basic habitability and enjoyment of the occupancy of their homes, including acting to prevent such tenants from making complaints or taking other action concerning the condition of the properties so as to avoid having to expend promised funds to repair.

29.     It was further a part of the scheme and artifice that MERRYMAN pressed many tenants to pay rent in U.S. currency and refused to provide confirmatory receipts, which facilitated him demanding more than the agreed upon rent amount and evicting tenants even when they had paid rent.

30.     It was further a part of the scheme and artifice that MERRYMAN caused electronic transfers of information in furtherance of the scheme to occur between locations in the Eastern District of Virginia and terminals and/or computer servers located outside the Commonwealth of Virginia.

<u>E.P.</u>

31.     E.P. is an African American woman.

8

32.     In or about July 2015, E.P. rented a single-family home located at *** 31st Street, Newport News, Virginia, 23607, from MERRYMAN. E.P. lived in this home until she was evicted by MERRYMAN in or about August 2021.

33.     E.P. regularly paid MERRYMAN rent from 2015 until she was laid off from her job in 2021 during the pandemic and suffered some medical problems resulting in her hospitalization. Specifically, E.P. fell behind on her rent in the summer of 2021. While E.P. was hospitalized or soon thereafter, MERRYMAN sent a crew to remove all her belongings from her home and had her car towed. E.P. lost all her belongings in the house.

34.     On or about May 10, 2021, MERRYMAN, aided and abetted by others known and unknown to the Grand Jury, applied to the VHDA for approximately $15,100.00 in rent relief benefits for E.P. at *** 31st Street in Newport News, Virginia, 23607. E.P. did not know about, consent to, or otherwise authorize or benefit from this application. MERRYMAN, aided and abetted by others known and unknown to the Grand Jury, used E.P.'s name and forged her signature on the rent relief application, all without her consent.

35.     MERRYMAN falsely represented to the VHDA that E.P. owed back rent beginning as early as June 2020 through August 2021. MERRYMAN further submitted a fabricated residential lease agreement and an addendum to renew and extend the lease, wherein he again forged E.P.'s signature and used E.P.'s name without her consent.

36.     Despite obtaining approximately $15,100.00 rent relief benefits for E.P. from the VHDA, MERRYMAN evicted E.P. anyway, citing her unpaid rent. In total, MERRYMAN filed three legal actions to evict E.P., which have continued to affect E.P. and prevent her from obtaining housing.

9

37.     While E.P. rented a home from MERRYMAN, he repeatedly interfered with her right to lease and occupy the dwelling.  For instance, when the plumbing backed up into the house, MERRYMAN said it was "probably her weave."  MERRYMAN then told E.P. to "clean the house like when you were slaves."  MERRYMAN repeatedly called E.P. and her family "n*****s" and "trash."

38.     In or about 2017, after MERRYMAN refused to repair the property and continued to harass E.P., she told MERRYMAN that he should leave or he would get what's coming to him, (or words to that effect).  MERRYMAN became enraged and responded by retrieving a tire iron, and advancing on E.P., brandishing the tire iron as if he was going to strike her with it, while saying, "who's going to get what?"

39.     Also, during her tenancy, two of what E.P. described as MERRYMAN's "enforcers" came to demand rental money from E.P.  Both men pursuing E.P. for rent money were not only armed but also brandished firearms and acted in a threatening and hostile manner toward E.P.  While brandishing a firearm, one of the men told E.P. that it was time to "pay the big man."

<u>C.T.</u>

40.     C.T. is an African American man.

41.     In or about June 2018, C.T. rented a single-family home located at **** 30th Street, Newport News, Virginia, 23607, from MERRYMAN.  C.T. prepaid ten months of rent to move in the home totaling approximately $10,000.00.  When C.T. moved in, doors were missing, the water heater was broken, and the air conditioning did not work.  MERRYMAN promised to repair the

10

property and further said he would credit C.T.'s rent for any repairs he made himself or for which he paid contractors to make.

42.    C.T. paid a contractor to fix the water heater.  He also had his father travel from Philadelphia to fix the air conditioner.  When C.T. asked to deduct these costs from the rent in accordance with MERRYMAN's promise when getting him to sign the lease, MERRYMAN called C.T. a "n*****" and claimed he was going to raise the rent to $1,450.00 per month.

43.    After C.T. had made these and other reasonable requests to be reimbursed for repairs to MERRYMAN's property, MERRYMAN began making unannounced visits to the property, including inside the home in violation of state and local ordinances.

44.    When C.T. requested that MERRYMAN fix the air conditioner, MERRYMAN justified his refusal to make the repair by saying, "y'all should be used to that . . . you're black. You can take the heat a little bit."  When C.T. continued to request that MERRYMAN fix the air conditioning, MERRYMAN threatened his life.

45.    On or about August 23, 2018, MERRYMAN made an unannounced visit to the house.  C.T. asked him to leave.  MERRYMAN became enraged and swung a lawn mower at C.T. MERRYMAN then picked up a shovel, and while calling C.T. a "n*****," hit C.T. in the face with the shovel.

46.    MERRYMAN had C.T. evicted by falsely claiming he had not paid rent.  C.T. did not have records to substantiate his prepayment of rent, so he was forced to vacate the property.

### J.N. and M.E.

47.    J.N. is an African American man.  M.E. is an African American woman.

48.    In or about April 2018, J.N. and M.E. rented a single-family home located at **** 30th Street in Newport News, Virginia 23607 from MERRYMAN.  When J.N. moved in, raw

11

sewage was leaking into the home, light fixtures were broken, the tile in the bathroom was cracked, the house was infested with rodents, and the floor was rotting so badly that it caused J.N. to fall through the floor into the crawl space and injure himself. MERRYMAN promised to repair the property to induce J.N. and M.E. to lease from him.

49.     After J.N. and his family moved in, when he made reasonable requests to repair the property, MERRYMAN responded by saying things like, "you fix it yourself. Get off your butt and go to work and get a job, you black n*****."

50.     The sewage backing into the house had a foul odor. J.N. requested that MERRYMAN repair the plumbing. MERRYMAN not only again refused to repair it but also responded by threatening J.N. saying he would beat J.N.'s "black ass" if he had to come over to the house.

51.     After the flooring problems worsened and MERRYMAN refused to repair them, J.N. reported the issues to the Newport News Department of Codes Compliance ("Codes Compliance").

52.     Codes Compliance is the local agency charged with protecting the health, safety, and general welfare of the public through the administration and uniform enforcement of laws and regulations related to land use, building construction and property maintenance. Codes Compliance enforces the state's building code, the state's property maintenance code, and the city's zoning ordinances.

53.     In response to J.N.'s report, Codes Compliance inspected the condition of the property and found several violations. MERRYMAN attempted to speak to the inspector for Codes Compliance during the inspection, but the inspector continued to document violations at the

12

property. This enraged MERRYMAN, and he physically assaulted J.N. by checking his shoulder into J.N.'s body during the inspection.

54. During the time J.N. resided at **** 30th Street from in or about April 2018 through December 2020, he consistently paid his monthly rent.

55. In or about December 2020, MERRYMAN, aided and abetted by others known and unknown to the Grand Jury, began working on an application for rent relief benefits for J.N. at the **** 30th Street address.

56. On or about May 10, 2021, MERRYMAN submitted an application to the VHDA for approximately $12,150.00 in rent relief benefits for J.N. at the **** 30th Street address. J.N. did not know about, consent to, authorize, or otherwise benefit from this application. MERRYMAN assumed J.N.'s identity, using his personally identifying information on the rent relief application and signing the application as J.N. without his consent.

57. In that application, MERRYMAN further falsely represented to the VHDA that J.N. continued to reside in the property through August 2021 and that he failed to pay rent for the period June 2020 through August 2021. MERRYMAN included a fabricated letter in the rent relief application from Outback Steakhouse that purported to lay off J.N.'s wife, M.E. The letter read: "G'Day Mate, we regretfully inform you, Ms. [M.E.], due to slower than usual business sales, we and most dining establishments will need to lay off wait staff until more business picks up." M.E. never worked at Outback Steakhouse.

58. Another tenant, R.H. had moved into the property in or about February 2021 through the U.S. Department of Housing and Urban Development's Housing Choice Voucher Program ("Section 8"), as administered through the Newport News Redevelopment and Housing

13

Authority ("NNRHA").   The NNRHA paid the majority of R.H.'s monthly rent payments beginning, in part, in February 2021 and continuing through at least January 2022.

59.    The Section 8 program prohibits owners from charging or accepting, from the family or any other source, any payment for rent of the unit in addition to the rent to owner.  The ERA program similarly prohibits duplicative payments of any other federally funded rental assistance.

**L.G.**

60.    L.G. is an African American woman.

61.    In or about the summer of 2018 to in or about the summer of 2019, L.G. rented the single-family home located at **** 41st Street in Newport News, Virginia 23607 from MERRYMAN.  When L.G. moved in, the property did not have a stove or a door on the refrigerator and needed to be treated for infestation by roaches and rodents.  MERRYMAN promised to repair these problems to induce L.G. to rent the home, but never did so.

62.    When L.G. made reasonable requests to repair the property, MERRYMAN responded by calling L.G. a "n*****" and telling her that "you n*****s are always looking for something for nothing."  MERRYMAN messaged L.G., "I have 23 people still owe me rent money from September, and Guess what!!!! They are all black!!!!"  MERRYMAN frequently responded to L.G.'s basic housing requests with mocking, non-responsive messages like "black lives matter."

63.    After moving into the property, the HVAC system stopped working.  When L.G. reported the problem to MERRYMAN, he accused her of stealing the HVAC unit.

64.    In response to L.G. continuing to make reasonable requests to repair the home she was renting, MERRYMAN became frustrated in or about April 2019, and his harassment culminated in a threat to turn L.G. and her "black ass kids" into "potting soil."

14

65.    L.G. sought and obtained a protective order against MERRYMAN. MERRYMAN responded to the order by, among other things, parking his vehicle just outside the prohibited radius of the order and making his presence known by staring at L.G. and her family.

### V.L.

66.    V.L. is an African American woman.

67.    In or about March 2019, V.L. rented the single-family home located at *** Hickory Avenue, Newport News, Virginia, 23607, from MERRYMAN. When V.L. moved in, the house's roof leaked, windows and the air conditioner were broken, and it had plumbing issues that caused V.L to incur a water bill for approximately $1,000.00.

68.    MERRYMAN promised to fix the issues with the property when V.L. inquired about renting the property, as part of his attempt to induce her to lease the property, but he later refused to do so after she had moved in.

69.    While V.L. and her family were renting from MERRYMAN, the furnace caught fire and the fire department had to respond to put out the flames. MERRYMAN refused to help V.L. clean the house and remediate the smoke damage, which exacerbated her grandson's asthma.

70.    In or about December 2020, V.L. and her family purchased a home elsewhere and moved out of *** Hickory Avenue.

71.    On or about November 14, 2020, MERRYMAN applied to the VHDA for approximately $12,600.00 in rent relief benefits for V.L. at *** Hickory Avenue. The claimed rent relief benefits were for July 2020 through May 2021, which covered, in part, a period of time that V.L. did not live in the property.

15

72.     Another tenant, J.H., moved into the property in or about January 2021.  The NNRHA paid the majority of J.H.'s monthly rent payments pursuant to the Section 8 program beginning, in part, in January 2021 and continuing through at least December 2021.

73.     V.L. was not aware of this application, did not consent to, authorize, or otherwise benefit from this application.  MERRYMAN assumed V.L.'s identity, using her personally identifying information on the rent relief application and signed the application as J.N. without her consent.

### H.R.

74.     H.R. is an African American man.

75.     Since 2001, H.R. has been the Director of the City of Newport News Department of Codes Compliance.  In that capacity, he supervises approximately forty-one employees, many of whom are inspectors who ensure that properties are safe and comply with land-use regulations and other applicable rules.

76.     MERRYMAN owns dozens of rental homes in areas of downtown Newport News that are required to have a property inspection and rental inspection certificate from H.R.'s office.

77.     MERRYMAN is known to Codes Compliance and its employes due to his having had a long history of rental properties with frequent and repeated failures to comply with the city's rules and regulations and to meet standards of relating to the condition and habitability of the property.

78.     In or about July 2020, MERRYMAN complained to H.R. about one of his inspectors and about receiving citations for failing to comply with the city's regulations.  When H.R. advised MERRYMAN to seek advice from an attorney, MERRYMAN responded by e-mail, they're "having a BLM rally tonight" and "you wanna go[?]"

16

79.     In or about November 2019, MERRYMAN called H.R. to complain about his office condemning one of his properties because it was structurally compromised.  When H.R. refused MERRYMAN's request to ignore the problems with the property, MERRYMAN complained that Codes Compliance should condemn a different property.

80.     On or about November 20, 2019, MERRYMAN's harassment of H.R. in his capacity as an employee escalated.  MERRYMAN was angry about Codes Compliance condemning one of his properties.  H.R. told MERRYMAN that he could not be verbally abusive to his staff and that MERRYMAN was not going to raise his voice at him.  In response, MERRYMAN threatened H.R. that he would "beat [his] n***** ass."  MERRYMAN then came to City Hall and confronted H.R. in the lobby of the building as he was leaving work, trying to goad him into starting a fight.

Ty.B.

81.     Ty.B. is an African American woman.

82.     In or about December 2019, Ty.B. rented a single-family home located at **** 41st Street, Newport News, Virginia 23607 from MERRYMAN.

83.     The majority of Ty.B.'s rent was paid by the NNRHA through the Section 8 program.  For MERRYMAN to be eligible to receive payments from NNRHA for Ty.B., the property had to meet Housing Quality Standards relating to the condition of the property.

84.     The Housing Quality Standards for Section 8-assisted properties are published at Title 24, Code of Federal Regulations (CFR) § 982.401.  The CFR states that, "All program housing must meet the HQS performance requirements both at commencement of the assisted occupancy, and throughout the assisted tenancy."  Among other things, the Housing Quality Standards require that the dwellings have an oven, and a stove or range, and a refrigerator of

17

appropriate size for the family. Dwellings must have and be capable of maintaining a thermal environment healthy for the human body. There must be a safe system for heating the dwelling unit (and a safe cooling system, where present). The system must be able to provide adequate heat (and cooling, if applicable), either directly or indirectly, to each room, in order to assure a healthy living environment appropriate to the climate.

85.    Additionally, the Housing Quality Standards require that the dwelling unit must be structurally sound. The structure must not present any threat to the health and safety of the occupants and must protect the occupants from the environment. The ceilings, walls, and floors must not have any serious defects such as severe bulging or leaning, large holes, loose surface materials, severe buckling, missing parts, or other serious damage. The roof must be structurally sound and weathertight. The exterior wall structure and surface must not have any serious defects such as serious leaning, buckling, sagging, large holes, or defects that may result in air infiltration or vermin infestation. Further, the unit must be in sanitary condition and be free of vermin and rodent infestation.

86.    Ty.B.'s rental home was in very poor condition, and needed a lot of work at the time she moved in. She typically would not have rented the property in the condition it was in, but she had a new daughter and needed a place to live quickly. MERRYMAN told Ty.B. that if she paid for the work that the house needed, he would deduct what she paid from the rent. Ty.B. said at the time she moved in, there was a plumbing leak in the bathroom, and the ceilings leaked when it rained. Ty.B. stated the heat and air conditioning worked on the first day she lived in the property, but never worked again after that. She had to purchase space heaters and air conditioning window units with her own money. Additionally, the planks on the front porch were "popping," and there were no locks on the doors.

18

87.    On or about December 3, 2019, MERRYMAN executed a Housing Assistance Payments (HAP) Contract with the NNRHA. Among other things, MERRYMAN certified that as the owner of the property he would maintain the contract unit and premises in accordance with the Housing Quality Standards.

88.    In documentation submitted to the NNRHA, MERRYMAN made a number of material, false representations to obtain housing benefit payments. He falsely represented that the property had a functioning heating and cooling system, a working oven, microwave, washing machine, dryer, garbage disposal, ceiling fans, a dishwasher, and a driveway. In fact, as MERRYMAN then and there well knew, the property did not have a microwave, a garbage disposal, a washer and dryer, ceiling fans, or a driveway. The "Proposed Section 8 Unit Information" form showed that the property was built in 1983. According to the Newport News Real Estate Assessment website, the property was built in 1930. At the bottom of the Proposed Section 8 Unit Information form, MERRYMAN falsely characterized it, in summary, as a "Very Nice."

89.    In reality, when Ty.B. moved into the property, it was in poor condition. In fact, the NNRHA's inspection of the property on December 3, 2019, noted several items that failed and needed to be corrected. Those items included, correcting the cause of a water leak that resulted in water stains, correcting floor tripping hazard at the front entrance, correcting the cause for water leaking underneath kitchen sink, correct GFI switch that does not function.

S.F.

90.    S.F. is a white woman.

91.    In or about December 2019, S.F. rented the single-family home located at ** Salem Street, Hampton, Virginia, 23669, from MERRYMAN.

19

92. S.F., at the time, had been employed in security services for a hotel. In or about the summer of 2020, S.F. lost her employment as a result of the COVID-19 pandemic.

93. Without steady pay, S.F. fell behind on her rent. MERRYMAN began to direct racially-based harassment at S.F., telling her things such as, "F that you're still working and you're white, don't give me that n***** shit." He also regularly called S.F. a "n***** lover" because her best friend was African American. S.F. asked MERRYMAN what race had to do with it. MERRYMAN responded, "cause all my white people are paying me and 18 n*****s aren't."

94. MERRYMAN sent S.F. the following messages:

| MERRYMAN | Your chosen to be a n*****<br>That's ok<br>You'll see who the real n***** is |
|---|---|
| S.F. | Are you threatening me?! |
| MERRYMAN | Take it how you want to n*****<br>The cops have been there a total of 9 times since you've lived there |
| S.F. | That's a lie |
| MERRYMAN | Your and your crazy wife are the real problem |
| S.F. | I'm done arguing with ignorance I'll see you in court |
| MERRYMAN | Lol ok<br>Just like a n*****<br>Pay your bills like other white people<br>But then again you have a bunch of n***** friends it seems like<br>So maybe you're a n***** lover<br>Kinda funny when you don't have any roommates you run out of money ....... |

95. In or about the fall of 2020, S.F. attempted to apply to VHDA for rent relief benefits. Her application was denied because she needed certain documentation from MERRYMAN such as a ledger of rent payments that she did not have and MERRYMAN would not give her.

20

96.    MERRYMAN wanted to apply for more rent relief payments and demanded S.F. work for him or face eviction.  S.F. agreed to do so.

97.    S.F. struggled to compile applications for MERRYMAN's properties because he did not have the necessary paperwork like leases and ledgers of rent payments for his properties.

98.    S.F. worked in MERRYMAN's office where he had sticky notes on the wall that said, "don't attack anybody today, you can't go back to jail."

99.    S.F. contacted tenants to have them sign rent relief applications for MERRYMAN, but they refused.  Some of the tenants refused to consent because they did not trust MERRYMAN. Others did not want to see MERRYMAN compensated by the government for properties in such poor condition.  S.F. then witnessed MERRYMAN forge a rent relief application.

100.    On or about June 22, 2021, MERRYMAN applied to the VHDA for approximately $8,800.00 in rent relief benefits for S.F. at the ** Salem Street address.  S.F. was not aware of this application, did not consent to, or otherwise benefit from this application.  MERRYMAN assumed S.F.'s identity, using her personally identifying information on the rent relief application and forging her signature the application, all without her consent.

101.    MERRYMAN misspelled S.F.'s name on the rent relief application.

### F.D.

102.    F.D. is an African American woman.

103.    In or about April 2020, F.D. rented the single-family home located at *** 18th Street, Newport News, Virginia 23607 from MERRYMAN.  The property was in terrible condition.  When F.D. moved in, there were stains on the carpeting, a clogged sink full of water, a clogged toilet full of human waste, a ceiling light hanging by the wires, and broken windows. Before moving in, F.D. had only seen the outside of the property, which seemed fine.  When she

21

moved in, she found all of these problems. When she asked MERRYMAN about them, he told her to take him to court.

104. In or about the winter of 2021, F.D. lost her job as a housekeeper in Colonial Williamsburg because of the COVID-19 pandemic. She fell behind on her rent.

105. MERRYMAN responded by harassing F.D. He would call F.D. a "black n*****" and "black bitch." He made generalized references to black women with comments like, "you black bitches, you all get here and don't pay your money, you're getting out of here."

106. In or about October 19, 2020, MERRYMAN's threatened F.D. with a string trimmer. MERRYMAN came to F.D.'s home and called her phone. MERRYMAN demanded rent and refused to repair the property as requested by F.D. When F.D. opened the front door, she observed MERRYMAN wielding the string trimmer, which was on at the time. MERRYMAN threatened F.D., saying "what are you going to do you black bitch, what you going to do now? I'm here, you can't do nothing with me."

107. In or about November 2020, F.D. worked with MERRYMAN to complete an application for rent relief benefits from the VHDA. He never communicated to her whether he received any benefits or submitted the application. On or about May 10, 2021, MERRYMAN applied to the VHDA for approximately $13,770.00 in rent relief benefits for F.D. at the *** 18th Street address.

108. On the benefit application submitted on or about May 10, 2021, MERRYMAN falsely represented that F.D. had not paid rent from in or about July 2020 through in or about June 2021. This was untrue. MERRYMAN continued to demand F.D. make payments to him during this period.

22

109.    Despite obtaining rent relief benefits for F.D. from the VHDA, MERRYMAN evicted F.D., citing her unpaid rent for the same period.  This was in violation of the Landlord Agreement section of the Rent Relief application, which required MERRYMAN to agree, "I acknowledge and agree to the requirement that I must not evict the renter for non-payment of the rent associated with any of the months for which the rent relief payment is made."

110.    The rent relief benefits MERRYMAN received for F.D. were for the time-period July 2020 through September 2021.  Concurrent with F.D.'s eviction, MERRYMAN received a judgment against her for $20,400 plus late fees totaling $2,047 and attorney fees of $5,610.  The judgment covered 17 months of F.D.'s rent payments, including at least seven that MERRYMAN already received rent relief benefits for.

### E.S.

111.    E.S. is an African American man.

112.    E.S. owned a concrete construction business based in Hampton, Virginia.  He worked in the concrete construction business for more than 40 years.

113.    Individual 1 hired MERRYMAN to build a new driveway, but he failed to complete the job in a timely fashion.  MERRYMAN excavated Individual 1's old driveway, but he did not build a new one.  Individual 1 hired E.S. to finish the job and construct his new driveway.

114.    On or about July 8, 2020, shortly after E.S. finished the project for Individual 1, he received a call from a phone number ending in 2700.  MERRYMAN identified himself on the call.  MERRYMAN repeatedly threatened E.S., stating "You stole, you stole my job, n*****, and I will kill your ass, n*****.  I'm going to take you to court for stealing my job, n*****."

23

115.    MERRYMAN was not satisfied with the above threats, though, and he immediately called back to threaten him another time, telling E.S. to "watch your back, n*****, because I'm going to kill your n***** ass."

116.    E.S. was worried for his safety, so he sought and obtained a protective order against MERRYMAN.  Notwithstanding that order, in or about March 2021, MERRYMAN came to a different jobsite where E.S. was working and stared at him and his team, which violated the protective order obtained by E.S.

117.    After MERRYMAN threatened E.S. in July 2020, he did not bid on or work jobs where MERRYMAN was involved for fear that MERRYMAN would kill him.

### E.D. and A.D.

118.    E.D. is an African American woman.  A.D. is an African American man.

119.    In or about October 2020, E.D. and A.D. rented a single-family home located at *** 17th Street, Newport News, Virginia 23607 from MERRYMAN.  When E.D. and A.D. moved in, the floor was at risk of collapsing and there was a sizeable hole in the floor into the crawl space under the house.  The home also had mold that caused respiratory issues for the minor daughter of E.D. and A.D.

120.    E.D. and A.D. repeatedly asked MERRYMAN to repair the property to make it habitable.  MERRYMAN refused and belittled E.D. and A.D by using racial slurs.

121.    In or about December 2020, E.D. and A.D. vacated the property out of concern of the health issues their minor daughter was experiencing because of the mold.

122.    After E.D. and A.D. left the property, they were contacted by a representative of MERRYMAN who asked them to sign paperwork for rent relief benefits.  They refused to do so, as they did not want to see him unfairly compensated for the property.

24

123.    On or about May 10, 2021, MERRYMAN applied to the VHDA for approximately $9,700.00 in rent relief benefits for E.D. and A.D. at the *** 17th Street address.  Neither E.D. nor A.D. consented to, authorized, or otherwise benefited from this application.  MERRYMAN assuming the identity of E.D. and A.D., using their names and forging their signatures on the rent relief application, all without their consent.

124.    After E.D. and A.D. refused to apply for rent relief, MERRYMAN mocked them and told them that he was "still getting his money" by applying for rental assistance with or without their consent.

### E.M.

125.    E.M. is an African American woman.

126.    In or about 2021, MERRYMAN hired E.M. to help him apply for rent relief benefits from VHDA.  E.M. was a landlord herself and had had success applying for rent relief benefits in that capacity and as an advisor to others.

127.    MERRYMAN bragged to E.M. about using a backhoe to evict tenants illegally by removing the waterline to condemn properties.  Because all residences must have running water to be habitable, by removing the property's access to running water, MERRYMAN made it uninhabitable and could trigger its condemnation.

128.    E.M. reviewed MERRYMAN's business records in connection with facilitating various rent relief applications.  E.M. found notes in his business files about which tenants had "Black Lives Matter" signs and indications that MERRYMAN would attempt to damage or remove them.

129.   E.M.'s review of MERRYMAN's files revealed deficiencies in his recordkeeping. Many of his property files did not contain leases, addenda to renew leases, rental ledgers, or other basic documentation.

130.   MERRYMAN agreed to pay E.M. a percentage commission for the rent relief benefits she obtained for his properties, but he did not follow through on that promise. MERRYMAN paid E.M. approximately $14,000.00 for her work, but that was not the full sum of the money he owed her.

131.   E.M. asked MERRYMAN what to do if she could not reach his tenants or if they refused to sign the rent relief paperwork.  He directed her to falsify the paperwork and submit the applications anyway.

132.   One at least one occasion, E.M. witnessed MERRYMAN forge a tenant's signature on a rent relief application.

133.   On another occasion, MERRYMAN directed E.M. to put together a rent relief application for a property where he was already paid, in part, with rent subsidies from the Section 8 program.

<u>J.I.</u>

134.   J.I. is an African American woman.

135.   In or about August 2021, J.I. rented a single-family home located at *** Blair Avenue, Newport News, Virginia 23607 from MERRYMAN.

136.   J.I.'s rent was paid, in part, by the NNRHA through the Section 8 program.  For MERRYMAN to be eligible to receive payments from NNRHA for J.I., the property had to meet certain requirements ("Housing Quality Standards") relating to the condition of the property.

26

137. On or about July 21, 2021, MERRYMAN executed a Housing Assistance Payment (HAP) Contract with the NNRHA. Among other things, MERRYMAN certified that as the owner of the property he would maintain the contract unit and premises in accordance with the Housing Quality Standards. The HAP Contract stated, "Unless the owner has complied with all provisions of the HAP contract, the owner does not have a right to receive housing assistance payments under the HAP contract."

138. In documentation submitted to the NNRHA, MERRYMAN made a number of material, false representations to obtain housing benefit payments. He falsely represented that the property had a functioning heating and cooling system, a working oven, microwave, washing machine, and dishwasher. In fact, as MERRYMAN then and there knew, the appliances did not function as he represented. At the bottom of the Proposed Section 8 Unit Information form, MERRYMAN falsely characterized it, in summary, as a "very nice house." On the form, MERRYMAN reported that the house was built in 1978 and renovated in 2021. According to the City of Newport News, the property was built in 1920.

139. In reality, when J.I. moved into the property, it was in poor condition. In addition to the non-functioning appliances described above, there were vermin in the attic and numerous dangerous structural issues, including a rotting floor, the front porch resting on unsteady cement blocks, cracks in the foundation, and exposed insulation.

140. To induce J.I. to rent the premises, MERRYMAN promised to repair these issues and make the property habitable, but he did not do so. The NNRHA later began to withhold rent benefits from MERRYMAN because he did not complete the necessary repairs per the terms of the contract, including within the specified time period.

27

141.   As a result of his anger related to the withheld NNRHA funds, MERRYMAN began harassing J.I. and otherwise interfering with her living at the property, including her reasonable, quiet enjoyment of the same. He threatened to shut off the utilities. He entered the property without her consent. He made disparaging, false comments that she was lazy and needed to work for a living because she was eligible for housing assistance. When J.I. would explain how his assumptions were incorrect, he would brush her off with mocking comments like "black lives matter."

## T.D.

142.   T.D. is an African American woman.

143.   In or about November 2019, T.D. rented the single-family home located at **** 16th Street, Newport News, Virginia, 23607. T.D. had previously rented the same unit a few years prior from MERRYMAN, and did not want to return, but felt compelled to do so because she had limited options for housing.

144.   When T.D. moved in, there was mold throughout the house and exposed wiring. When T.D. made reasonable requests to MERRYMAN to repair the property, he responded with comments like, "y'all black people never want to pay rent."

145.   In 2020, T.D. lost her job during the pandemic. When she informed MERRYMAN, he said, "That's why I'm putting you n*****s out."

146.   T.D. attempted to apply for rent relief benefits from VHDA herself. When she notified MERRYMAN, he told her to bring the application to his office. After reviewing the paperwork, he offered to hire T.D. and pay her $20 per hour to work on rent relief applications for his other properties.

28

147.   When T.D. reviewed MERRYMAN's business records, she found that many of the properties did not have leases or other basic documentation. MERRYMAN directed T.D. to "make leases for the properties."

148.   MERRYMAN also directed T.D. to forge the signatures of tenants on the leases. When T.D. refused to do so, MERRYMAN told T.D. he would forge the signatures himself.

149.   T.D. worked for approximately 40 hours on rent relief applications for MERRYMAN, but he never compensated her for those hours worked, despite promising to do so.

### E.W.

150.   E.W. is an African American woman.

151.   In or about December 2019, E.W. rented the single-family home located at *** Glendale Road, Hampton, Virginia, 23661, from MERRYMAN. The Glendale Road house was in serious disrepair when E.W. took possession. Among other things, the toilet in the bathroom did not work, there was a hole in the wall patched with paper plate, and bricks were falling off the house. MERRYMAN promised to repair the property or credit E.W.'s rent for any repairs she made herself.

152.   When E.W. asked MERRYMAN to make reasonable repairs to the property after she had moved in, he responded with mocking comments and attempted to evict her by condemning the property.

153.   When E.W. was unsuccessful at getting the repairs MERRYMAN had promised, she called Codes Compliance about the condition of the property. When they put violation stickers on the home, MERRYMAN illegally removed them.

154.   MERRYMAN also became angry when he learned that E.W. called Codes Compliance on him, so he destroyed the waterline to the house with a backhoe.

29

155. On or about May 10, 2021, MERRYMAN, aided and abetted by others known and unknown to the Grand Jury, applied to the VHDA for approximately $18,000.00 in rent relief benefits for E.W. at *** Glendale Road, Hampton, Virginia 23661. E.W. did not consent to, authorize, or otherwise benefit from this application. MERRYMAN assumed E.W.'s identity, using her name and forging E.W.'s signature on the rent relief application, all without E.W.'s consent.

156. The final application submitted contained several mistakes making it clear that it was evident that MERRYMAN and not E.W. completed the application. For instance, MERRYMAN misspelled E.W.'s own name on the rent relief application and misstated her age. MERRYMAN also wrongly listed her as having a dependent child in the residence.

157. MERRYMAN falsely represented to the VHDA that E.W. lost her job at a restaurant during the pandemic. In fact, E.W. did not work for a restaurant.

<u>Ta.B.</u>

158. Ta.B. is an African American woman.

159. In or about January 2021, Ta.B. rented a single-family home located at **** 30th Street, Newport News, Virginia 23607 from MERRYMAN.

160. All of Ta.B.'s rent was paid by the NNRHA through the Section 8 program. For MERRYMAN to be eligible to receive payments from NNRHA for Ta.B., the property had to meet Housing Quality Standards relating to the condition of the property.

161. Contrary to the Housing Quality Standards, the house was infested with rodents and neither the heat nor the air conditioning worked. In fact, the rodents got so bad, Ta.B. had to move her family to a hotel.

30

162. On or about January 14, 2021, MERRYMAN caused the execution of a HAP Contract with the NNRHA on his behalf. Among other things, MERRYMAN, aided and abetted by others known and unknown to the Grand Jury, certified that the property met and would be maintained in accordance with the Housing Quality Standards.

163. In documentation submitted to the NNRHA, MERRYMAN made a number of material, false representations to obtain housing benefit payments. He falsely represented that the property had a functioning heating and cooling system, a stove and a refrigerator. In fact, as MERRYMAN then and there knew, the property did not have a functioning heating and cooling system, stove or refrigerator. The Proposed Section 8 Unit Information form showed that the property was built in 1980. According to the Newport News Real Estate Assessment website, the property was built in 1940. At the bottom of the Proposed Section 8 Unit Information form, MERRYMAN falsely characterized it, in summary, as a "Very Nice Unit."

<u>J.P.</u>

164. J.P. is a Puerto Rican man who identifies as Hispanic and is married to an African American woman.

165. In or about September 2022, J.P. rented the single-family home located at **** Shell Road, Hampton, Virginia 23661 from MERRYMAN. When J.P. moved in, the cabinets were infested with cockroaches. There was no stove or refrigerator. The carpets were dirty. There was black mold in the house. And the water heater was broken.

166. MERRYMAN told J.P. he would repair the property when J.P. was deciding whether to lease from him, but after J.P. moved in, MERRYMAN refused to make the requested repairs. When J.P. asked for repairs after moving into the property, MERRYMAN became

31

frustrated and made comments like calling J.P. a "n**** lover" (a reference to his African American wife).

167. On or about December 13, 2022, J.P. went to MERRYMAN's office to make a reasonable request that he fix the water heater. MERRYMAN violently refused, telling J.P. to "get the f*** out" and throwing an Allen wrench at him.

168. MERRYMAN then grabbed a chainsaw and threatened J.P. MERRYMAN cranked the chainsaw as if he was going to use it on J.P. MERRYMAN struck J.P. with the blade of the saw (while it was off) approximately four times while calling J.P. a "n*****," "sp*c," "dumb mother f*****," and "crackhead."

### S.M.

169. S.M. is an African American woman.

170. In or about December 2022, S.M. rented single-family home located at **** 42nd Street, Newport News, Virginia, 23607, from MERRYMAN. When S.M. moved into the 42nd Street property, sewage was backing up into the home, there was no functioning bathroom in the home, the sink was leaking, and there were holes in the exterior of the home to the outside.

171. While inducing S.M. to lease the property, MERRYMAN made materially false representations to her that he would repair the property before she moved in. In reliance on those false representations, S.M. paid MERRYMAN $4,500.00 in upfront costs to move into the property. The subsequent monthly rent was approximately $1,350.00.

172. S.M. soon withheld paying rent because there were so many issues with the property, including the repairs MERRYMAN had failed to make, notwithstanding his earlier promises. MERRYMAN refused to fix anything but still demanded to be paid rent. For instance, on one occasion, he came to the house and told S.M. they needed to reach an understanding about

32

the rent. While prominently displaying a firearm on his lap, MERRYMAN demanded that S.M. sign a promissory note to pay him rent. Fearing for her life, S.M. did so.

173. When S.M. made reasonable requests to repair the property, MERRYMAN called S.M. a "n****," made discriminatory comments about "y'all n*****s," and made comments about how "you people don't work" and want to "live off welfare."

174. MERRYMAN subsequently sued to evict S.M. He called demanding rent and S.M. told MERRYMAN to speak to her attorney. MERRYMAN responded threateningly, "Watch. You're going to see. You're going to see what's going to happen." MERRYMAN said he would turn off the water and call the authorities to take away S.M.'s children.

<u>G.G.</u>

175. G.G. is an African American man.

176. In or about October 2022, G.G. rented the single-family home located at *** Vaughan Avenue, Hampton, Virginia, 23661 from MERRYMAN. When G.G. and his family first saw the home, there was no functioning stove, no working refrigerator, the bathroom tub had a hole, the bathroom mirror was broken, and the shower drain was badly stained.

177. MERRYMAN falsely promised G.G. that he would repair the problems to induce G.G. to sign a lease and pay him upfront fees, including an initial deposit of approximately $1,000 on or about October 14, 2022, a move-in deposit of approximately $1,600.00 on or about October 27, 2022, and a combination of rent/deposit of approximately $1,150.00 on or about November 9, 2022. All of these payments by G.G. to MERRYMAN were sent through the mobile payment service, Cash App.

178. When G.G. made reasonable requests to repair the property, MERRYMAN responded with comments like, "you people, man, it's always the black ones that got to have the

33

problem with moving in." He also made non-responsive comments about "black lives matter" when discussing basic housing requests.

179.    In or about February 2023, MERRYMAN made an unannounced visit to the property with a crew of approximately five men. Without knocking on the door or otherwise notifying G.G. of their presence, MERRYMAN and the crew of men went into the backyard and began retrieving a pile of bricks and disassembling bricks that had been arranged as a fire pit.

180.    When G.G. confronted MERRYMAN about the unannounced visit, he became angry. When G.G. asked MERRYMAN why he would spend time on the bricks as opposed to fixing some of the more serious problems in the house, he responded, "man, these freaking black people, they always want something extra, man."

181.    When G.G. came closer, MERRYMAN asked one member of his crew, "hey, you still got your gun on you?" The man said he did and stood next to MERRYMAN with his hand behind his back, as if he was ready to draw the weapon. Afraid he would be shot or attacked, G.G. retreated back in the house briefly before coming outside again. MERRYMAN went over to the firepit and retrieved a brick, which he threateningly waved at G.G. while saying, "you black motherf*****. Y'all always want something." As MERRYMAN departed the property, he yelled, "f***ing n*****s, f***ing n*****s."

182.    A few weeks after the above incident, G.G. and his wife went to MERRYMAN's office to obtain a copy of his lease. MERRYMAN had turned off the electricity to the property, and G.G. needed a lease to have the utilities in his name. Rather than turn over the lease, MERRYMAN became angry and gestured as if he was going to retrieve a firearm from his desk. Victim G.G.'s wife fled the office in fear. G.G. challenged MERRYMAN and asked if he was

34

35

seriously going to shoot him.  Instead of a firearm, MERRYMAN retrieved a barbeque lighter from the desk.

## COUNTS ONE THROUGH TEN
### (Wire Fraud)

THE GRAND JURY CHARGES THAT:

1.    The factual allegations contained in the General Allegations section, including the description of the Scheme and Artifice to Defraud, are incorporated herein as if set out in full.

2.    From in or about November 2020 through in or about August 2021, the exact dates being unknown to the Grand Jury, in the Eastern District of Virginia and elsewhere, DAVID L. MERRYMAN, the defendant herein, aided and abetted by others known and unknown to the Grand Jury, with intent to defraud, knowingly devised and intended to devise the aforesaid scheme and artifice to defraud and for obtaining property by means of materially false and fraudulent pretenses, representations, and promises, which scheme and artifice and the execution thereof, operated in substance as follows and as further described in the General Allegations

3.    On or about the dates set forth below, in the Eastern District of Virginia and elsewhere, DAVID L. MERRYMAN, the defendant herein, for the purpose of executing the aforesaid scheme and artifice to defraud and to obtain money and property through materially false pretenses, representations, and promises as described above, did knowingly and willfully transmit and cause to be transmitted by means of wire communication in interstate commerce, certain signs, signals, and sounds as set forth in the table below, to and from and from and through computers and terminals in the Eastern District of Virginia from, to, and through computers and terminals outside of the Commonwealth of Virginia.

36

| Count | Date (on or about) | Wire Transmission |
|---|---|---|
| 1 | February 3, 2020 | MERRYMAN, aided and abetted by others known and unknown to the Grand Jury, defrauded M.E. by making false promises to repair her rental property in order to induce her to make payments to him.  MERRYMAN negotiated a money order from M.E., which he received under the foregoing false pretenses.  MERRYMAN negotiated the money order at Langley Federal Credit Union, resulting in the interstate transmission of information between Virginia and computers outside Virginia. |
| 2 | November 14, 2020 | MERRYMAN, aided and abetted by others known and unknown to the Grand Jury, submitted an inaccurate, unauthorized, and fraudulent electronic rent relief application to the Virginia Housing Development Authority via the internet in which he sought approximately $12,600 in rent relief benefits purportedly on behalf of V.L. for rent for *** Hickory Avenue in Newport News, Virginia, 23607.  This resulted in an interstate wire of funds from VHDA to MERRYMAN. |
| 3 | May 10, 2021 | MERRYMAN, aided and abetted by others known and unknown to the Grand Jury, submitted an inaccurate, unauthorized, and fraudulent electronic rent relief application to the Virginia Housing Development Authority via the internet in which he sought approximately $12,150.00 in rent relief benefits purportedly on behalf of J.N. for rent for **** 30th Street in Newport News, Virginia 23607.  This resulted in an interstate wire of funds from VHDA to MERRYMAN. |
| 4 | May 10, 2021 | MERRYMAN, aided and abetted by others known and unknown to the Grand Jury, submitted an inaccurate and fraudulent electronic rent relief application to the Virginia Housing Development Authority via the internet in which he sought approximately $13,770.00 in rent relief benefits purportedly on behalf of victim F.D. for rent for *** 18th Street, Newport News, Virginia 23607.  This resulted in an interstate wire of funds from VHDA to MERRYMAN. |

37

| 5 | May 10, 2021 | MERRYMAN, aided and abetted by others known and unknown to the Grand Jury, submitted an inaccurate, unauthorized, and fraudulent electronic rent relief application to the Virginia Housing Development Authority via the internet in which he sought approximately $9,700.00 in rent relief benefits purportedly on behalf of E.D. and A.D. for rent for *** 17th Street, Newport News, Virginia 23607. This resulted in an interstate wire of funds from VHDA to MERRYMAN. |
| --- | --- | --- |
| 6 | May 10, 2021 | MERRYMAN, aided and abetted by others known and unknown to the grand jury, submitted an inaccurate, unauthorized, and fraudulent electronic rent relief application to the Virginia Housing Development Authority via the internet in which he sought approximately $15,100.00 in rent relief benefits purportedly on behalf of E.P. for rent for*** 31st Street in Newport News, Virginia, 23607. This resulted in an interstate wire of funds from VHDA to MERRYMAN. |
| 7 | May 10, 2021 | MERRYMAN, aided and abetted by others known and unknown to the Grand Jury, submitted an inaccurate, unauthorized, and fraudulent electronic rent relief application to the Virginia Housing Development Authority via the internet in which he sought approximately $18,000.00 in rent relief benefits purportedly on behalf of E.W. for rent for *** Glendale Road, Hampton, Virginia 23661. This resulted in an interstate wire of funds from VHDA to MERRYMAN. |
| 8 | June 22, 2021 | MERRYMAN, aided and abetted by others known and unknown to the Grand Jury, submitted an inaccurate, unauthorized, and fraudulent electronic rent relief application to the Virginia Housing Development Authority via the internet in which he sought approximately $8,800.00 in rent relief benefits purportedly on behalf of S.F. for rent for ** Salem Street, Hampton, Virginia, 23669. This resulted in an interstate wire of funds from VHDA to MERRYMAN. |
| 9 | September 1, 2022 | MERRYMAN, aided and abetted by others known and unknown to the Grand Jury, defrauded S.M. by making false promises to repair her rental property in order to induce her to make payments to him. MERRYMAN negotiated a money order from S.M., which he received under the foregoing false |

38

| | | |
|---|---|---|
| | | pretenses. MERRYMAN negotiated the money order at Langley Federal Credit Union, resulting in the interstate transmission of information between Virginia and computers outside Virginia. |
| 10 | October 27, 2022 | MERRYMAN, aided and abetted by others known and unknown to the Grand Jury, defrauded G.G. by making false promises to repair his rental property in order to induce him to make payments to him. G.G. paid MERRYMAN a move-in deposit with the mobile payment service Cash App, resulting in the interstate transmission of information between Virginia and computers outside of Virginia. |

(All in violation of Title 18, United States Code, Sections 1343 and 2.)

39

## COUNTS ELEVEN THROUGH FOURTEEN
(Interference with Housing)

THE GRAND JURY CHARGES THAT:

1.    The factual allegations contained in the General Allegations section are incorporated herein as if set out in full.

2.    On or about the dates and in the manner set forth below, in the Eastern District of Virginia, DAVID L. MERRYMAN, the defendant herein, aided and abetted by others known and unknown to the Grand Jury, did by force and threat of force, willfully injure, intimidate, and interfere with, and attempt to injure, intimidate and interfere with, the victims set forth below, because of their race and color, and because the victims were renting, financing and occupying a dwelling, or negotiating for the rental, financing or occupation of any dwelling:.

| Count | Date (in or about) | Victim | Interference with Housing by Force and Threats of Force |
|---|---|---|---|
| 11 | April 2019 | L.G. | In response to L.G.'s requests to repair her rental home, MERRYMAN, aided and abetted by others known and unknown to the Grand Jury, threatened to turn L.G. and her "black ass kids" into "potting soil" by "[send]ing whoever he wants." |
| 12 | May 2019 | J.N. | In response to J.N. calling Codes Compliance to inspect his rental home due to structural issues with the flooring, MERRYMAN, aided and abetted by others known and unknown to the Grand Jury, threatened to beat J.N.'s "black ass" and physically assaulting him with a shoulder check. |

40

| 13 | December 13, 2022 | J.P. | In response to J.P.'s request to restore hot water to his rental home, MERRYMAN, aided and abetted by others known and unknown to the Grand Jury, physically attacked J.P. with a chainsaw while calling him a "n*****," "sp*c," "dumb mother f*****," and "crackhead." This offense involved the use and threatened use of a dangerous weapon. |
| 14 | February 2023 | G.G. | In response to G.G.'s request to make repairs to his rental home, MERRYMAN, aided and abetted by others known and unknown to the Grand Jury, threatened G.G. with his employee's firearm and by wielding a brick while calling him a "black mother f*****" and a "n*****." This offense involved the use and threatened use of a dangerous weapon. |

(All in violation of Title 42, United States Code, Section 3631 and Title 18, United States Code, Section 2.)

41

<u>COUNTS FIFTEEN AND SIXTEEN</u>
(Interstate Communications with Threats to Injure)

THE GRAND JURY FURTHER CHARGES THAT:

1. The factual allegations contained in the General Allegations section are incorporated herein as if set out in full.

2. On or about the dates and in the manner set forth below, in the Eastern District of Virginia and elsewhere, DAVID L. MERRYMAN, the defendant herein, knowingly and willfully did transmit in interstate and foreign commerce, the following threatening communications to injure and murder.

| Count | Date (in or about) | Victim | Interstate Communication with Threat to Injure |
|---|---|---|---|
| 15 | November 18, 2019 | H.R. | While on a call routed in interstate commerce, MERRYMAN threatened H.R. that he would "do whatever he wants" and "beat [his] n***** ass." |
| 16 | July 8, 2020 | E.S. | While on a call routed in interstate commerce, MERRYMAN threatened E.S., "You stole, you stole my job, n*****, and I will kill your ass, n*****." MERRYMAN threatened further, "watch your back n*****, because I'm going to kill your n***** ass." |

(All in violation of 18 U.S.C. § 875(c) and 2.)

42

## COUNTS SEVENTEEN THROUGH TWENTY-TWO
### (Theft of Government Money)

THE GRAND JURY FURTHER CHARGES THAT:

1.     The factual allegations contained in the General Allegations section are incorporated herein as if set out in full.

2.     On or about the dates and in the manner set forth below, in the Eastern District of Virginia, DAVID L. MERRYMAN, the defendant herein, aided and abetted by others known and unknown to the Grand Jury, willfully and knowingly did steal, purloin, and convert to his use without authority the government money and property set forth below, of a value exceeding $1,000.00, of the goods and property of the United States.

| Count | Date (on or about) | Theft of Government Property |
|---|---|---|
| 17 | May 10, 2021 | MERRYMAN, aided and abetted by others known and unknown, embezzled, stole, and converted to his use approximately $12,150.00 in rent relief benefits for tenant J.N. as purported rent due and owing for the lease of **** 30th Street in Newport News, Virginia 23607. |
| 18 | May 10, 2021 | MERRYMAN, aided and abetted by others known and unknown, embezzled, stole, and converted to his use approximately $13,770.00 in rent relief benefits for F.D. as purported rent due and owing for the lease of *** 18th Street, Newport News, Virginia 23607. |
| 19 | May 10, 2021 | MERRYMAN, aided and abetted by others known and unknown, embezzled, stole, and converted to his use approximately $9,700.00 in rent relief benefits for E.D. as purported rent due and owing for the lease of *** 17th Street, Newport News, Virginia 23607. |

43

| 20 | May 10, 2021 | MERRYMAN, aided and abetted by others known and unknown, embezzled, stole, and converted to his use approximately $15,100.00 in rent relief benefits for E.P. as purported rent due and owing for the lease of *** 31st Street in Newport News, Virginia, 23607. |
| 21 | May 10, 2021 | MERRYMAN, aided and abetted by others known and unknown, embezzled, stole, and converted to his use approximately $18,000.00 in rent relief benefits for E.W. as purported rent due and owing for the lease of *** Glendale Rd, Hampton, Virginia 23661. |
| 22 | June 22, 2021 | MERRYMAN, aided and abetted by others known and unknown, embezzled, stole, and converted to his use approximately $8,800.00 in rent relief benefits for S.F. as purported rent due and owing for the lease of ** Salem Street, Hampton, Virginia, 23669. |

(All in violation of Title 18, United States Code, Sections 641 and 2.)

44

## COUNT TWENTY-THREE THROUGH TWENTY-SIX
### (Housing and Urban Development Fraud)

THE GRAND JURY FURTHER CHARGES THAT:

1. The factual allegations contained in the General Allegations section are incorporated herein as if set out in full.

2. On or about the dates and in the manner set forth below, in the Eastern District of Virginia, DAVID L. MERRYMAN, the defendant herein, aided and abetted by others known and unknown to the Grand Jury, made, passed, uttered, and published false statements, as set forth below, all of which were false as he then and there knew, for the purpose of influencing the Department of Housing and Urban Development to approve the Newport News Redevelopment & Housing Authority to issue payments to MERRYMAN through the Housing Choice Voucher Program.

| Count | Date (on or about) | Housing and Urban Development Fraud |
|---|---|---|
| 23 | December 3, 2019 | To obtain housing assistance benefits from the Department of Housing and Urban Development, MERRYMAN, aided and abetted by others known and unknown to the Grand Jury, falsely represented that the property being rented by Ty.B. located at **** 41st Street, Newport News, Virginia 23607, met and would be maintained to meet certain Housing Quality Standards, had a functioning heating and cooling system, a working oven, microwave, washing machine, dryer, garbage disposal, ceiling fans, a dishwasher, and a driveway. |
| 24 | January 14, 2021 | To obtain housing assistance benefits from the Department of Housing and Urban Development, MERRYMAN, aided and abetted by others known and unknown to the Grand Jury, falsely represented that the property being rented by Ta.B. located at **** 30th Street, Newport News, Virginia 23607, met and would be maintained to meet certain Housing Quality Standards, had a functioning heating and cooling system as well as a working stove and refrigerator. |

| 25 | February 24, 2021 | MERRYMAN, aided and abetted by others known and unknown to the Grand Jury, falsely represented that he would not receive payments, from the tenant or any other source, for the property being rented by R.H. located at **** 30th Street in Newport News, Virginia 23607, to obtain payments from the Department of Housing and Urban Development under the Section 8 program. In fact, he received rent relief benefits for J.N. from the VHDA for the same period. |
| --- | --- | --- |
| 26 | July 21, 2021 | To obtain housing assistance benefits from the Department of Housing and Urban Development, MERRYMAN, aided and abetted by others known and unknown to the Grand Jury, falsely represented that the property being rented by J.I. located at *** Blair Avenue, Newport News, Virginia 23607, met and would be maintained to meet certain Housing Quality Standards, had a working heating system, air conditioner, oven, microwave, clothes washer, and dishwasher |

(All in violation of Title 18, United States Code, Sections 1010 and 2.)

46

## COUNTS TWENTY-SEVEN THROUGH THIRTY
(Aggravated Identity Theft)

THE GRAND JURY FURTHER CHARGES THAT:

1.    The factual allegations contained in the General Allegations section are incorporated herein by reference as if set out in full.

2.    On or about the dates and in the manner set forth below, in the Eastern District of Virginia and elsewhere, DAVID L. MERRYMAN, the defendant herein, aided and abetted by others known and unknown to the Grand Jury, did unlawfully, knowingly, and intentionally transfer, possess, and use, without lawful authority, a means of identification of another during and in relation to felony violations of provisions contained in Chapter 63 of Title 18, to wit: wire fraud, in violation of Title 18, United States Code, Section 1343.

| Counts | Date (on or about) | Description of Transaction | Felony Violation(s) |
|--------|--------------------|----------------------------|----------------------|
| 27 | May 10, 2021 | Without lawful authority, MERRYMAN, aided and abetted by others known and unknown to the Grand Jury, used J.N.'s name, other information and forged her signature to obtain by fraud rent relief benefits from the VHDA. | 18 U.S.C. § 1343; 18 U.S.C. § 641 (ref. Counts 3, 17) |
| 28 | May 10, 2021 | Without lawful authority, MERRYMAN, aided and abetted by others known and unknown to the Grand Jury, used E.D.'s name, other information and forged her signature to obtain by fraud rent relief benefits from the VHDA. | 18 U.S.C. § 1343; 18 U.S.C. § 641 (ref. Count 5) |
| 29 | May 10, 2021 | Without lawful authority, MERRYMAN, aided and abetted by others known and unknown to the Grand Jury, used E.P.'s name, other information and forged her signature to obtain by fraud rent relief benefits from the VHDA. | 18 U.S.C. § 1343; 18 U.S.C. § 641 (ref. Counts 6, 20) |

47

48

| 30 | May 10, 2021 | Without lawful authority, MERRYMAN, aided and abetted by others known and unknown to the Grand Jury, used E.W.'s name, other information and forged her signature to obtain by fraud rent relief benefits from the VHDA. | 18 U.S.C. § 1343; 18 U.S.C. § 641<br><br>(ref. Counts 7, 21) |

(All in violation of Title 18, United States Code, Sections 1028A and 2.)

49

## FORFEITURE

THE GRAND JURY FURTHER FINDS PROBABLE CAUSE THAT:

1.      The defendant, if convicted of any of the violations alleged in Counts One through Ten and Fifteen through Twenty-Two of this indictment, shall forfeit to the United States, as part of the sentencing pursuant to Federal Rule of Criminal Procedure 32.2, any property, real or personal, which constitutes or is derived from proceeds traceable to the violation.

2.      If any property that is subject to forfeiture above is not available, it is the intention of the United States to seek an order forfeiting substitute assets pursuant to Title 21, United States Code, Section 853(p) and Federal Rule of Criminal Procedure 32.2(e).

(In accordance with Title 18, United States Code, Section 981(a)(1)(C); and Title 28, United States Code, Section 2461(c).)

49

UNITED STATES v. DAVID L. MERRYMAN, et al., 4:24-cr-

A TRUE BILL:

_____

F O R E P E R S O N

Jessica D. Aber
United States Attorney

By:     _____
D. Mack Coleman
Assistant United States Attorney
Eastern District of Virginia – Newport News
Fountain Plaza Three, Suite 300
721 Lakefront Commons
Newport News, Virginia 23606
Tel. (757) 591-4000
Fax: (757) 591-0866
Email: mack.coleman@usdoj.gov

By:     _____
Julie D. Podlesni
Assistant United States Attorney
Eastern District of Virginia – Newport News
Fountain Plaza Three, Suite 300
721 Lakefront Commons
Newport News, Virginia 23606
Tel. (757) 591-4000
Fax: (757) 591-0866
Email: julie.podlesni@usdoj.gov

50

By: _____

Brian J. Samuels
Assistant United States Attorney
Eastern District of Virginia
Fountain Plaza Three, Suite 300
721 Lakefront Commons
Newport News, Virginia 23606
Tel. (757) 591-4000
Fax: (757) 591-0866
Email: brian.samuels@usdoj.gov

51